## Leib *against* The Commonwealth.

An Associate Judge of a court of common pleas is not a county officer within the meaning of the second section of the act of the 14th of June 1836: and that court has not jurisdiction to inquire by a writ of *quo warranto* into the authority by which he holds the office.

A day to which a court was adjourned is part of the same term at which the adjournment was made.

The classification of the Associate Judges made by the act of assembly of the 20th of June 1839, is the constitutional and binding classification under the amended constitution and schedule; and the legislature of 1840 had no power over the subject.

ERROR to the common pleas of *Schuylkill* county.

The Commonwealth of Pennsylvania *ex relatione* Ovid F. Johnson, Attorney-General, against Samuel D. Leib.

The proceeding in the common pleas was a *quo warranto* issued upon the suggestion of the attorney-general, to show by what warrant the defendant claimed to exercise the office of associate judge of the court of common pleas of Schuylkill county.

Suggestion. "Be it remembered that at a court of common pleas, held the thirty-first day of March in the year of our Lord one thousand eight hundred and forty, in and for said county, comes Ovid F. Johnson, attorney-general of the said commonwealth, by F. W. Hughes, his deputy in and for said county, and on behalf of said commonwealth, gives the said court here to know and be informed that, by the amended constitution of said commonwealth, which was agreed to in convention on the twenty-second day of February in the year of our Lord one thousand eight hundred and thirty-eight, and adopted, ratified and confirmed by the citizens of the said commonwealth on the ninth day of October of said last-mentioned year; and the fact of its being so adopted, duly declared and proclaimed by the governor on the eleventh day of December in the year of our Lord one thousand eight hundred and thirty-eight, it is provided, *inter alia,* in the second section of the fifth article to the said constitution as follows, to wit: The judges of the supreme court; of the several courts of common pleas, and of such other courts of record as are or shall be established by law, shall be nominated by the governor, and by and with the consent of the senate, appointed and commissioned by him. The associate judges of the court of common pleas shall hold their offices for the term of five years, if they shall so long behave themselves well. That by the schedule to said constitution it is provided, that the legislature shall divide the associate judges of the said state into four

[Leib v. The Commonwealth.]

classes, to be arranged according to the seniority of their commissions. That it appears from said amended constitution and schedule, and from the decision of the supreme court of said commonwealth, in the case of the said commonwealth against Oristus Collins, that from the said time of the adoption of the said amended constitution as aforesaid, until the first day of January 1839, the governor of said commonwealth had no authority to appoint and commission any judge of any court of common pleas for said commonwealth, for, or longer than until the said first day of January 1839. That between the time of the adoption of said amended constitution as aforesaid and the said first day of January 1839, Samuel D. Leib, Esquire, of said county, was appointed and commissioned an associate judge for said county, in the room of Daniel Yost, by virtue of a commission duly issued by Joseph Ritner, then governor of said commonwealth, bearing date the 29th day of December 1838, to have and to hold said office of associate judge so long as he should behave himself well. That by an act of the legislature of this commonwealth, entitled, " An act supplementary and explanatory of an act entitled an act to classify the associate judges of the state," it is, in the first section thereof, among other things, provided, that the commission of the said Samuel D. Leib shall expire on the 27th day of February 1840. That notwithstanding the provisions of said amended constitution and schedule, and said decision of the supreme court, and notwithstanding the said provision of the first section of said act of assembly, the said Samuel D. Leib now continues to hold, use and exercise the office of associate judge of said county, without warrant or lawful authority for so doing, whereupon the said attorney-general, on behalf of the commonwealth of Pennsylvania, gives the said court here to understand and be informed, that the said Samuel D. Leib, from and since the first day of January, A. D. 1839, hath used and exercised, and still doth use and exercise the office of associate judge of said county without any warrant or lawful and constitutional authority therefor, which said office, and the powers, authorities, emoluments and franchises thereto belonging and appertaining, the said Samuel D. Leib, during all the time aforesaid, hath usurped and still doth usurp upon the government of said commonwealth to the great damage and prejudice of the lawful authorities of the same. Whereupon the said attorney-general, by his said deputy, makes a suggestion and complaint herein and for due process of law against the said Samuel D. Leib in this behalf to be made, to answer by what warrant he claims to have, use, exercise and enjoy the aforesaid office."

Schuylkill County, ss. F. W. Hughes being duly sworn, says, that the above suggestion as to all matters of fact contained therein is true to the best of his knowledge and belief.

F. W. HUGHES.

Sworn before me this 31st of March 1840, WM. F. DEAN, J. P.

IX.—S

Writ. " Schuylkill County, ss.   The commonweaith of Pennsylvania to the sheriff of Schuylkill county, Greeting:  We command you that you summon Samuel D. Leib, so that he be and appear before our county court of common pleas, to be holden at Orwigsburg, in and for the county aforesaid, on the seventeenth day of April 1840, and then and there to show by what authority he claims to exercise the office of associate judge in the said county of Schuylkill, and have you then and there this writ.   Witness the Honourable James M. Porter, Esquire, President of our said court at Orwigsburg, the thirty-first day of March, in the year of our Lord one thousand eight hundred and forty."

Plea to the jurisdiction.  "And the said Samuel D. Leib, in his own proper person, comes and says that this court ought not to have or to take further cognizance of the action aforesaid, because he says that the said supposed causes of action, and each and every of them (if any such have accrued to the said commonwealth) are not within the jurisdiction of, or cognizable by, this court, but that the supreme court of Pennsylvania have exclusive jurisdiction thereof, and not this court, and this the said Samuel D. Leib is ready to verify.   Wherefore he prays judgment whether this court can or will take further cognizance of the action aforesaid."

" And now, May 27th 1840, comes Ovid F. Johnson, attorney for said commonwealth by F. W. Hughes his deputy, and avers that that court has jurisdiction, and by law may take cognizance of the matters contained in the said suggestion, and prays that the said plea of the said respondent to the jurisdiction of this court in manner and form as above pleaded may be overruled, and that the said respondent be required to answer over in some better manner, and this he is ready to verify."

Upon the question as to the jurisdiction, the court below declared the following opinion:

" To the writ of *quo warranto* issued to the respondent, requiring him to show by what authority he claims to hold and exercise the office of associate judge of the court of common pleas of Schuylkill county—the respondent has pleaded that this court has no jurisdiction of the matters complained of, &c., and prays the dismissal of the proceedings upon that ground.

" The attorney-general has averred the power and jurisdiction of this court in the premises, and prayed that the said plea may be overruled, and the respondent called upon to answer, &c.

" For the respondent it has been contended, that the act of assembly, giving the courts of common pleas jurisdiction in cases of *quo warranto*, does not authorise the proceedings against a person claiming to hold and exercise the office of associate judge, which it is said is an office ' of the commonwealth,' and not ' a county office' within the meaning of the act.

" It will be necessary to examine the constitution and various acts of assembly, to see for what purposes courts of common pleas

were established, how the judges thereof are to be appointed, and the nature and extent of their powers and jurisdiction, in order to determine this question.

" The 18th section of the act of 1834, (Purdon, 207,) establishes or rather continues the courts of common pleas, by the name and style of ' the court of common pleas of (the respective) county.' The 19th section declares that the courts of common pleas of the several counties of this commonwealth, except the county of Philadelphia, shall consist of a president judge and two associate judges. The 20th section declares that the president and associate judges of the courts of common pleas, or any two of them, or the presiding judge, in the absence of his associates, shall have power to hold the said courts, and to hear and determine all causes, matters and things cognizable therein, according to the constitution, laws and usages of this commonwealth. Section 27 provides that, ' it shall be the duty of the governor from time to time, as any vacancy may occur in the office of judge in any of the said counties, to appoint and commission a suitable person to be judge of the court of common pleas of such county. Section 29 provides that, ' the courts of common pleas of every county shall be holden four times in every year at the courthouse of the respective county, and at and during the times hereinafter specified for each term, if the business depending in the said courts respectively shall require it,' &c.

" The 12th section of the act of 16th of June 1836, is in the following words: ' The courts of common pleas shall have jurisdiction and power within their respective counties, to hear and determine all pleas, actions and suits, and causes, civil, personal, real and mixed, according to the constitution and laws of this commonwealth: And the said courts shall have power to grant, under their judicial seals, all lawful writs and process, necessary for the exercise of such jurisdiction,' &c.

" The 3d section of the 5th article of the amended constitution provides, ' until otherwise directed by law, the courts of common pleas shall continue as at present established.' The 4th section of that article declares that, ' the jurisdiction of the supreme court shall extend over the state'—and the 5th, 7th, 8th and 9th sections speak of the judges of the court of common pleas ' in each county,' ' of each county,' and ' within each county'—and of the jurisdiction of the president judges ' within their respective circuits,' and of the judges of the court of common pleas ' within their respective counties.'

" We have, therefore, in Pennsylvania, in our general system—1st, judges of ' the supreme court of the commonwealth of Pennsylvania;' 2d, president judges ' of the several courts in the ———— judicial district or circuit, consisting of the counties of ———— in the said commonwealth,' and 3d, ' associate judges of the courts of common pleas of (the respective) counties.'

[Leib v. The Commonwealth.]

" The commission of the respondent, which has been read to us, and is dated the 29th of December 1838, appoints him 'to be one of the judges of the court of common pleas, in and for the county of Schuylkill. Hereby giving and granting unto you, as associate judge, full right and title to have, and to execute all and singular the powers, jurisdiction and authorities, and to receive and enjoy all and singular the lawful emoluments, of a judge of the said court of common pleas, in and for the county aforesaid, agreeably to the constitution and laws of this commonwealth; to have and to hold, &c., so long as you behave yourself well.'

" Let us now turn to the act of 14th of June 1836, which confers on courts of common pleas the power and jurisdiction in case of *quo warranto*. It is under this act alone that we derive our power in such cases. Prior to its passage the jurisdiction was confined exclusively to the supreme court; by it the form of proceeding is modified and the jurisdiction in certain specified cases conferred upon the court of common pleas, *concurrently with the supreme court*. Its language is, 'writs of *quo warranto* may be issued by the judges of the supreme court, in the form and manner hereinafter provided, in all cases in which the writ of *quo warranto*, at common law, may have been issued, and in which the said court has heretofore possessed the power of granting informations in nature of such writs.'

" 'Writs of *quo warranto* in the form and manner hereinafter provided, may also be issued by the several courts of common pleas concurrently with the supreme court in the following cases:

" 'I. In case any person shall usurp, intrude into, or unlawfully hold or exercise any township or county office, within the respective county.

" 'II. In case any person *duly elected or appointed to any such* office, shall have done, suffered or omitted to do any act, matter or thing, whereby a forfeiture of his office shall by law be created.

" 'III. In case any question shall arise concerning the exercise of any office in any corporation, created by authority of law, and having the chief place of business within the respective county.'

" The sole question for decision, to determine this question of jurisdiction is, whether a person who is commissioned to be 'an associate judge of the court of common pleas, in and for the county of Schuylkill,' is a person holding or exercising 'a county office within such county.'

" By the reference made to the constitution and acts of assembly, as well as the commission of the respondent in the present case, it appears that an associate judge is and *ought to* be appointed to perform his duties in, for and within the county.

" Out of the territorial limits of the county, he is powerless as an officer.

" It is very true that the constitution, article 5, section 1, says, 'The judicial power of the commonwealth shall be vested in a

[Leib v. The Commonwealth.]

supreme court, in courts of oyer and terminer, and general jail delivery, in a court of common pleas, orphans' court, register's court, and a court of quarter sessions of the peace for each county, in justices of the peace, and in such other courts as the legislature may, from time to time, establish.' And it is also true, that the salaries of the judges are directed by law to be paid out of the treasury of the commonwealth. Yet we do not perceive that there is any thing in either of these provisions which takes away the local character of the associate judge of the county court. Every officer whose office is created under the constitution or laws of the commonwealth, is, in a certain sense, a commonwealth officer; but he will be further classified as a township, county or district officer, according to his powers and duties, and the nature and extent of the authority conferred upon him.

" The only difficulty cast upon the subject is by the notes appended, by the gentlemen appointed to revise the civil code, to the act of 14th of June 1836, giving us jurisdiction in case of *quo warranto*—(see 2 *Parke & Johnson* 811,) in which they say: ' The first three specifications relate to municipal and other corporate offices.' And in their notes to the act of 15th of April 1834, entitled ' an act relating to counties, townships, and county and township officers,' where they say: ' It may be proper here to remark, that we intend by county and township officers those only who are elected by the people of the several counties for county purposes. Prothonotaries, registers, recorders, &c., being appointed by the executive of the commonwealth, appear to us to be properly state officers, although, acting in and for the several counties, and have certainly no immediate connection with the county organization. They are not, therefore, embraced in the present bill, but will be embraced under a different head.'

" Independent of the explanatory note to the act of 14th of June 1836, there would, in our judgment, be no doubt that the terms ' holding or exercising any township or county office, within the respective county,' would embrace associate judges. The explanation, that these specifications relate to ' municipal and other corporate offices,' will not, in the proper interpretation of the word ' municipal,' vary this construction. Because that term, although meaning ' of or pertaining to a town or township, or a borough or city corporation,' also applies ' to a district composed of a certain number of towns and townships,' and, as extended by Blackstone, ' to one whole state or nation.' It, therefore, does not restrict or confine the term ' county office within the respective county,' to narrower limits than those terms import.

" The notes to the act of 15th of April 1834, have reference to that act alone, and what was meant by those gentlemen in relation to it. They ought not to control and limit the legitimate bearing and effect of a statute upon an entirely different subject, enacted two years thereafter.

IX.—S*

[Leib v. The Commonwealth.]

" In a question of this kind, where we even doubted, we would incline to that construction which would most tend to promote public convenience, and the due administration of justice.   These were the objects which the legislature had in view in passing the act in question.   There are not less than one hundred associate judges—three hundred prothonotaries, clerks of courts, registers of wills and, and, and recorders of deeds—and not less than two thousand justices of the peace and aldermen, besides one hundred sheriffs and coroners in the commonwealth.   To cast the jurisdiction in all these cases (where there is a contest about who is a proper officer) exclusively upon the supreme court, would overload that court with business, and prevent it from attending to its, at present, too onerous duties.   The object of the act in question was to relieve it from a part of its burthens, by conferring on the common pleas *quo warranto* jurisdiction in the specified cases.   Inasmuch, therefore, as the party aggrieved will have the right, when the case is decided in the court of common pleas, to remove it by writ of error to the supreme court, and bring the whole case up before that tribunal in bank for immediate hearing, when it sits in the district, little danger need be apprehended from improper decisions in the court below; more especially, as in a doubtful case, the court would not award execution until a final decision in the court of the last resort.

" We are of opinion, that this court has jurisdiction in the premises, and we overrule the respondent's plea to the jurisdiction, and direct that he make answer to the suggestion and writ."

Plea in abatement.   " And the said Samuel D. Leib, by Edward Owen Parry, his attorney, comes into court, and prays judgment of the writ issued against him in this case, because he says that the said writ is not made returnable at any time within term, as is required by the fifth section of the act of assembly of this commonwealth, passed the fourteenth day of June in the year of our Lord one thousand eight hundred and thirty-six, entitled ' an act relating to writs of *quo warranto* and mandamus,' and this he is ready to verify; wherefore he prays judgment of the said writ, and that the same may be quashed."

Samuel D. Leib, the respondent in this case, upon his solemn affirmation saith, that the facts set forth in the plea hereto annexed, are true to the best of his knowledge and belief.

SAMUEL D. LEIB.

Affirmed and subscribed before me this 17th day of April, A. D. 1840.                              CHARLES WITMAN.

Replication.   " And now May 27, 1840, comes Ovid F. Johnson, by F. W. Hughes, his deputy, on behalf of the said commonwealth, and saith, that the said writ, by reason of any thing by the said respondent in his said plea alleged, ought not to be quashed, because the said writ was issued during the March term, A. D. 1840, of the court of common pleas for said county, returnable on the

seventeenth day of April, eighteen hundred and forty; and that the said March term has been adjourned from day to day until the said seventeenth day of April, eighteen hundred and forty, and this the said commonwealth prays may be inquired of by the record. The said commonwealth therefore prays, that the said answer of the said respondent, in abatement of the writ in manner and form aforesaid pleaded, may be overruled, and that the said respondent may be ordered and required to plead to and answer the said suggestion."

Rejoinder. "And the said respondent, as to the said replication of the said commonwealth, to the plea of the said respondent, which the said commonwealth hath prayed may be inquired by the record, he doth the like."

Answer. "And now the twenty-seventh day of May, in the year of our Lord one thousand eight hundred and forty, comes the said Samuel D. Leib, by Edward Owen Parry, his attorney, and protesting that the suggestion filed in this case is altogether insufficient in law, and that he need not, according to the law of the land to make answer thereunto; nevertheless, for a plea in this behalf, he saith that the said commonwealth ought not to implead him by reason of the premises in the said suggestion set forth, because he saith, that at the time of the adoption of the amendments to the constitution of the commonwealth of Pennsylvania, his excellency Joseph Ritner, was governor of the said commonwealth; and by the fifth section of the schedule to the said amendments, it was provided, that the governor who should be elected in October, eighteen hundred and thirty-eight, should be inaugrated on the third Tuesday in January, eighteen hundred and thirty-nine, to which time the then executive term was thereby extended. And the said Joseph Ritner, so being the governor of the said commonwealth of Pennsylvania, did, by a commission in due form of law, bearing date the twenty-ninth day of December, in the year of our Lord eighteen hundred and thirty-eight, under the great seal of the commonwealth, signed and issued by the said Joseph Ritner, then being governor of the said commonwealth, according to the constitution of the said commonwealth, did appoint and commission the said Samuel D. Leib, to fill the said office of associate judge of the county of Schuylkill, which was then vacant, which said commission duly signed and sealed, bearing date as aforesaid, the said Samuel D. Leib brings here into court. And the said Samuel D. Leib further saith, that afterwards to wit: on the thirty-first day of December, A. D. eighteen hundred and thirty-eight, he duly accepted the said commission, and on the same day last mentioned, duly and according to the constitution and laws of this commonwealth, took and subscribed the affirmation required by the said constitution and laws, and entered upon the duties of the said office of associate judge of Schuylkill county aforesaid, and has continued from thence hitherto, continually to perform the same duties, and still doth per-

[Leib v. The Commonwealth.]

form the said duties according to the said constitution and laws, and under and by virtue of the said appointment and commission. And the said Samuel D. Leib further saith, that by the ninth section of the schedule of the said amendments of the said constitution it is provided, that the legislature of this commonwealth, at its first session under the amended constitution, should divide the associate judges of the state, other than the associate law judges into four classes. That the commissions of those of the first class should expire on the twenty-seventh day of February, eighteen hundred and forty; those of the second class on the twenty-seventh day of February, eighteen hundred and forty-one; of those of the third class on the twenty-seventh day of February, eighteen hundred and forty-two; and of those of the fourth class, on the twenty-seventh day of February, eighteen hundred and forty-three: that the said classes from the first to the fourth, should be arranged according to the seniority of the commissions of the several judges. And the said Samuel C. Leib further saith, that the legislature of the said commonwealth, at its first session under the amended constitution, to wit: on the twentieth day of June, in the year of our Lord one thousand eight hundred and thirty-nine, did, by an act entitled ' an act to classify the associate judges of the state,' divide the associate judges of the state into four classes, and arranged the same according to the seniority of their commissions; and by the fourth section of the said act, did provide that the said Samuel D. Leib, among others, should constitute the fourth class, whose commissions should expire on the twenty-seventh day of February, eighteen hundred and forty-three. And the said Samuel D. Leib further saith, that the said act of assembly passed the seventh day of March, A. D. eighteen hundred and forty, entitled an act supplementary to and explanatory of an act entitled an act to classify the associate judges of the state, and set forth in the said suggestion, is unconstitutional, null and void, and inoperative.

" And the said Samuel D. Leib further saith, that by the said schedule to the said constitution, it is not provided, that the legislature shall divide the associate judges of the said state into four classes, to be arranged according to the seniority of their commissions, as in the said suggestion is set forth; but by the said schedule to the said constitution, and in the ninth section of the said schedule it is provided, that the legislature of this commonwealth at its first session under the amended constitution, should divide the associate judges of the state, other than the associate law judges, into four classes as above set forth in this answer; and by the fourth section of the said schedule it is provided, that the general assembly which should convene in December, eighteen hundred and thirty-eight, should continue its session, notwithstanding the provisions of the eleventh section of the first article, and shall at all times be regarded as the first general assembly under the amended constitution. And the said Samuel D. Leib further saith, that it does not appear from

[Leib v. The Commonwealth.]

the said amended constitution and schedule, nor from the decision of the supreme court of the said commonwealth, in the case of the said commonwealth against Oristus Collins, that, from the said time of the adoption of the said amended constitution as aforesaid, until the first day of January, eighteen hundred and thirty-nine, the governor of the said commonwealth had no authority to appoint and commission any judge of any court of common pleas for said commonwealth, for or longer than until the first day of January, eighteen hundred and thirty-nine, as in the said suggestion is set forth, but that by the said constitution and the amendments, and by the decision of the supreme court in the said case of the said commonwealth against Oristus Collins, it does appear that the said governor of the said commonwealth, between the time of the adoption of the said amended constitution, viz: the ninth day of October, eighteen hundred and thirty-eight, and the first day of January, eighteen hundred and thirty-nine, had full power and authority to appoint and commission any judge of any court of common pleas for the said commonwealth, so long as he should behave himself well, subject only to the provisions of the said amended constitution and the said schedule. And the said Samuel D. Leib further saith, that he was not appointed and commissioned an associate judge for said county, in the room of Daniel Yost, as is set forth in the said information, but that he was appointed and commissioned an associate judge of the state for the county of Schuylkill, as is above set forth in this answer, and as manifestly appears by his said commission—without this the said Samuel D. Leib the office of associate judge of Schuylkill county, in the said suggestion mentioned, from and since the first day of January, A. D. eighteen hundred and thirty-nine, hath usurped, and still doth usurp upon the said commonwealth in the manner and form as by the said suggestion is supposed. All which the said Samuel D. Leib is ready to verify; as the court shall award, wherefore he prays judgment, and that the said office of associate judge of Schuylkill county, by him above claimed, may be adjudged and allowed to him, and that he may be dismissed and discharged by the court hereof, and from the premises above charged on him, &c."

The deputy attorney-general, on the part of the commonwealth, having craved oyer of the alleged commission, in the respondent's answer set forth, it was granted by the court in *hæc verba*.

Commission, Pennsylvania, [L. s. ] Joseph Ritner. In the name and by the authority of the commonwealth of Pennsylvania, Joseph Ritner, governor of the said commonwealth, to Samuel D. Leib, of the county of Schuylkill, esquire, sends greeting: know you that reposing especial trust and confidence in your integrity, judgment and abilities I, the said Joseph Ritner, have appointed, and by these presents do appoint and commission you, the said Samuel D. Leib, to be one of the judges of the court of common pleas, in and for the county of Schuylkill, hereby giving unto you as associate

[Leib v. The Commonwealth.]

judge, full right and title to have and to execute all and singular the powers, jurisdictions and authorities, and to receive and enjoy all and singular the lawful emoluments of a judge of the said court at common pleas, in and for the county aforesaid, agreeably to the constitution and laws of the commonwealth. To have and to hold this commission, and the office hereby granted, unto you the said Samuel D. Leib, so long as you shall behave yourself well. Given under my hand and seal of the commonwealth at Harrisburg, this twenty-ninth December, in the year of our Lord one thousand eight hundred and thirty-eight, and of the commonwealth the sixty-third.

" By the Governor.   J. WALLACE, *Deputy Secretary.*
" Recorded and examined, December 31, 1838.

          " JAC. HAMMER, *Recorder.*

"I, Samuel D. Leib, do solemnly, sincerely and truly declare and affirm, that I will support the constitution of the United States— that I will support the constitution of the commonwealth of Pennsylvania, and that I will perform the duties of an associate judge of the court of common pleas of Schuylkill county with fidelity.

           " SAMUEL D. LEIB.

" Affirmed and subscribed before me, December 31, 1838.

          " JAC. HAMMER,

       *"Recorder of Schuylkill county."*

Demurrer. " And thereupon Ovid F. Johnson, attorney general of the said commonwealth, by F. W. Hughes, his deputy, who for the said commonwealth prosecutes in this behalf, comes and saith, that the said answer of the said Samuel D. Leib, and the matter therein contained, in manner and form as the same are above pleaded and set forth, are not sufficient in law to bar or preclude the said commonwealth from having or maintaining the aforesaid proceeding thereof against him, the said Samuel D. Leib, and the said commonwealth is not bound by the law of the land to answer the same, and this the said commonwealth is ready to verify; wherefore, for want of a sufficient plea in this behalf, the said attorney prays judgment for the said commonwealth, and that the said defendant be ousted and altogether excluded from the office of associate judge aforesaid.

" And the said Ovid F. Johnson, attorney general as aforesaid, according to the form of the statute in such case made and provided, states and showeth the court the following causes of demurrer to the said plea.

" 1st. That the commission under which the said Samuel D. Leib claims to hold the office aforesaid having been issued on the twenty-ninth day of December, eighteen hundred and thirty-eight, the acting governor of the said commonwealth had no right to commission him to hold the said office ' so long as he should behave himself well.' And he could not, under such commission, exercise the duties of the said office from and after the first day of January eighteen hundred and thirty-nine.

[Leib v. The Commonwealth.]

" 2d. That the said plea is in other respects uncertain, informal, and insufficient," &c.

Joinder in Demurrer.  " And the said respondent saith, that his answer above pleaded, and the matters therein contained, in manner and form as the same are above pleaded and set forth, are sufficient in law to bar and preclude the said commonwealth from having or maintaining the aforesaid action thereof against the said respondent, and this the said respondent is ready to verify and prove as the court shall award; wherefore, inasmuch as the said commonwealth hath not answered the said plea, nor in any manner denied the same, the said respondent prays judgment, and that the said commonwealth may be barred from having or maintaining the aforesaid action thereof against the said respondent," &c.

" Whereupon the court below (Porter, president) delivered the following opinion:

" On the 31st day of March last, during the sitting of the court, the relator filed an *ex officio* information against the respondent, on which a writ of *quo warranto* issued, returnable on the ⸺ day of March last, which was served upon the respondent, and on the return thereof, the respondent put in a plea denying the jurisdiction of the court.  The commonwealth averred the jurisdiction of the court, and the question of jurisdiction was argued by the counsel. The court, on the 28th of March, delivered a written opinion, a copy of which is herewith filed, deciding that we had jurisdiction in the premises, overruling the respondent's plea to the jurisdiction, and directing him to make answer to the suggestion and writ.

The respondent thereupon pleaded in abatement to the writ, that the suggestion had not been verified by affidavit.  Although in strictness, this matter may not have been pleaded in proper season, yet to avoid all technical difficulties, and have a decision on the real matter in controversy, so that, if desired, the same might be reviewed by the supreme court at the earliest possible period, the court suggested to the deputy attorney-general to withdraw the proceeding and to commence *de novo*.

"Accordingly, on the said 28th of March 1840, the suggestion upon which the present writ issued was presented to the court and filed, and the court awarded the present writ of *quo warranto*, which was made returnable to this court upon the 17th day of April, now last past, and was served upon the respondent more than ten days before the return day.  The regular business of the term having been gone through, the court adjourned on the 1st day of April 1840 until the 17th day of the same month, at which time the president of the court was unable to attend, and the associate judges, who were present, adjourned the court until the 18th of April, and then to the 20th of the month, transacting the business before them, and adjourning the hearing of this case until the 27th of May 1840, at which time the president attended, and the relator having called upon the respondent to plead, he again presented his plea to the

jurisdiction of the court, which was overruled for the reasons stated in the opinion delivered upon the 28th of March last, and which are contained in a copy of that opinion hereto annexed, making part of the opinion in this case.

" The respondent then pleaded in abatement that the said writ of *quo warranto* was not made returnable at March term, when the suggestion was filed, but to a day subsequent to the end of that term—to which the commonwealth replied, that it was made return-able during the said March term, the said court having been ad-journed from day to day until the 17th of April 1840, as appeared by the record, and prayed that the same might be tried by the record, and the respondent did the like. The court on inspecting the record were of opinion with the commonwealth, overruled the said plea in abatement, and gave judgment of *respondeas ouster*.

"The respondent then pleaded in bar in substance, that on the 29th of December 1839, the office of associate judge, &c. being vacant, he was duly appointed and commissioned by Joseph Ritner, Esq. governor of Pennsylvania, by commission of that date, 'to be one of the judges of the court of common pleas in and for the county of Schuylkill. Hereby giving and granting unto you as associate judge, full right and title to have and to execute all and singular the powers, jurisdiction, and authorities, and to receive and enjoy all and singular the lawful emoluments of a judge of the said court of common pleas in and for the county aforesaid, agreeably to the constitution and laws of this commonwealth. To have and to hold, &c. so long as you behave yourself well.' Which office he accepted, and took the affirmations of office on the 31st day of the same month, in virtue whereof he hath the right to hold and exercise the said office. That by the terms of the amended constitution, and the act of 20th June 1839, he may lawfully hold and exercise, &c., and that the act of 7th March 1840 is unconstitutional and void.

" To this plea in bar, the commonwealth has demurred, and the respondent has joined in demurrer, and the question to be deter-mined is, whether the respondent, under his said commission, and the constitution and laws of the commonwealth, can rightfully ex-ercise the office of associate judge, &c.

" In the case of the Commonwealth *v.* Collins, 8 *Watts* 339, the supreme court decided, what was unquestionably the law, that by the provisions of the amended constitution, the present judges who were commissioned by the late Governor Ritner, between the time of the adoption of that instrument and the 1st day of January 1839, ceased, on the latter day, to have any right further to discharge their judicial functions; and this upon the principle, that the amended constitution provided for a new mode of appointment, to wit; by and with the advice and consent of the senate, and a new tenure, to wit, that for the term of ten years, if the incumbent should so long behave himself well; whereas, by the former constitution, the governor alone possessed the power of appointment, and the term

of office was so long as the incumbent behaved himself well; and that by the schedule to the amended constitution, there was provision made for continuing, during a limited period, the offices of those judges who should be in office at the time of the adoption of the amendments—whereas no provision whatever was made for the cases of those who might be appointed between the time of the adoption and the time of going into effect of the amended constitution.

" Although the particular case there decided was that of a president judge, it appears to the court that the principle is there too well established to admit of a doubt, that all commissions held under the commonwealth of Pennsylvania, issued in that interval, expired, except where the amended constitution otherwise provided, on the 1st day of January 1839.

" Does the case of an associate judge of the court of common pleas present a different case from that of the president judges? In the constitution of 1790, article 5, section 4, it is provided, 'until it shall be otherwise directed by law, the several courts of common pleas shall be established in the following manner:—The governor shall appoint in each county not fewer than three nor more than four judges, who, during their continuance in office, shall reside in such county. The state shall be by law divided into circuits, none of which shall include more than six nor fewer than three counties. A president shall be appointed of the courts in each circuit, who, during his continuance in office, shall reside therein. The president and judges, any two of whom shall constitute a quorum, shall compose the respective courts of common pleas.' The legislature, in accordance with the provisions of the constitution, subsequently provided that vacancies by the death or resignation of associate judges, should not be supplied until the number was reduced below two; and the act of 1834 provides that the courts of common pleas of the several counties of this commonwealth, except the county of Philadelphia, shall consist of a president and two associate judges, the said president, or any two of them, or the presiding judge, in the absence of his associates, shall have power to hold the courts,' &c.

" The constitution of 1790, article 5, section 2, provides that 'the judges of the supreme court, and of the several courts of common pleas, shall hold their offices during good behaviour.'

" By the amended constitution of 1838, it is provided (article 5, section 2), 'The judges of the supreme court, of the several courts of common pleas, and of such other courts of record as are or shall be established by law, shall be nominated by the governor, and by and with the advice of the senate, appointed and commissioned by him. The judges of the supreme court shall hold their offices for the term of fifteen years, if they shall so long behave themselves well. The president judges of the several courts of common pleas, and of such other courts of record as are or shall be established by law, and all other

IX.—T

judges required to be learned in the law, shall hold their offices for the term of ten years, if they shall so long behave themselves well. The associate judges of the courts of common pleas shall hold their offices for the term of five years, if they shall so long behave themselves well.'

" In article 2, section 8, it is provided, ' The governor shall nominate, and by and with the advice and consent of the senate, appoint all judicial officers of the courts of record, unless otherwise provided for in this constitution.'

"·The schedule to the amended constitution, section 9, provides that ' The legislature, at its first session under the amended constitution, shall divide the associate judges of the state into four classes. The commissions of those of the first class shall expire on the 27th day of February 1840; of those of the second class, on the 27th day of February 1841; of those of the third class, on the 27th day of February 1842; and of the fourth class, on the 27th day of February 1843. The said classes, from the 1st to the 4th, shall be arranged according to the seniority of the commissions of the several judges.' The language of this section of the schedule, it will be perceived, is different from that used in relation to the judges of the supreme court, to the president judges, and to the recorders of courts and other judges required to be learned in the law, when speaking of classifying them or of the time of the expirations of their commissions. In regard to the judges of the supreme court, the language used is, ' according to the dates of their commissions, on the first day of January next.' In regard to the president judges, it is ' at the time of the adoption of the amended constitution.' In regard to the recorders of mayors' courts, &c., it is ' now in office,' referring to the 22d of February 1838, when the amendments were all finally agreed to in convention.

" In regard to the associate judges, there is no provision whatever made in express terms, for those who might be appointed after the adoption of the amendments, and before the passage of the act of assembly for classifying the associate judges; but it is contended that, according to the terms used, we must refer the time to that at which the constitution went into effect, to wit: the first of January 1839.

" Under the constitution of 1790 Governor Ritner would have gone out of office on the third Tuesday of December 1838, and it was only by the express terms of the schedule that his term was extended beyond that time, and until the third Tuesday of January 1839. In that respect, therefore, the constitution did go into effect before the first of January 1839. But the power to appoint judges during this interval, is no where given to him expressly. It, however, existed in him of necessity to prevent a failure in the administration of justice; and the continuance of the office of those so appointed, was to be only so long as to meet the exigencies of the cases. It had then been decided by the citizens of the common-

[Leib v. The Commonwealth.]

wealth that there should be no more judges appointed to hold their offices during good behaviour; and hence there was not the same plea or equity for continuing the incumbents so appointed in the interval for a time, that there was in the case of those who were commissioned under the old constitution to hold, &c., during good behaviour, and who had their offices suddenly and unexpectedly terminated by the call of a convention and the change of the judicial tenure. The judge who accepted an office after the adoption of the amended constitution, accepted it with his eyes open and a full knowledge of the decision made by the people.

· "Here Daniel Yost, Esquire, who had held the commission for nearly thirty years, resigned after the 11th of December 1838, and although it is not contended that the respondent had any thing to do with procuring his resignation, yet still, but for that resignation, there would have been no vacancy to fill. The respondent was commissioned upon the 29th day of December 1838, which was after the time of the adoption of the amended constitution by the people, and after the fact of such adoption had been declared by proclamation by the governor.

"It is not necessary to raise the question here, but were it necessary so to do, we should hold that the time of the adoption of the amendments to the constitution was the second Tuesday of October 1838; for it was upon that day the people, to whom the question was submitted, passed upon the matter. The subsequent acts of making the returns, of counting those returns in the presence of the senators and representatives, and of proclaiming the result, are but the modes by which the fact of such adoption is made manifest or public. They constitute the legal evidence of the pre-existing fact —the adoption by the people. Such was the construction put upon it by the late executive of Pennsylvania, when, upon the 11th day of December 1838, he issued his proclamation declaring that the amended constitution had been adopted by the freemen of the commonwealth:—and in his proclamation of the 1st of January 1839, wherein he declares that the amended constitution had been adopted upon the 9th day of October then last past.

"It has been contended that the reasoning of Judge Kennedy, in the case of Collins, 8 *Watts* 342, is in favour of the construction that, as no time is mentioned, the 1st of January 1839 must be intended. At first blush this may appear so; but, when we consider what were the intentions of the members of the convention, as drawn from the contents of the instrument itself, and that such intent would be entirely defeated by such a view of the matter, we cannot adopt such a construction. The intention of the convention was to make a provision in favour of the judges commissioned under the constitution of 1790, and before the adoption of the amendments, 'so as' (in the language of the supreme court) 'to prevent their being driven at once from their offices, without allowing them some time at least to prepare for meeting the event.'

[Leib v. The Commonwealth.]

In carrying out this intent, they provided that the associate judges should be divided by the legislature into four classes, one of which classes should go out of office, according to seniority of commissions, in each of the years 1840, 1841, 1842 and 1843. Suppose one-fourth, one-third or one-half of the associate judges had resigned, and either been recommissioned, or their places supplied by the appointment of others, between the time of the adoption of the amendments and the 1st of January 1839, would not this classification have been defeated by the construction for which the respondent contends; and would not a set of men have been commissioned by the governor alone, in terms for good behaviour, but whose commissions could neither endure for the period of good behaviour nor for that of five years, but until the time when the last class should go out, to wit: the 27th of February 1843, a period of about four years and two months. And would not men who otherwise would have held either to 1841, 1842, or 1843, be thrown into an earlier class, thereby making the remaining judges, who did not resign, have their tenure dependent, not on the will of the convention, of the governor, of the people or the legislature, but on the will and pleasure of such other of the associate judges as might choose to resign before the 1st of January 1839. Such a state of things the constitution never contemplated, and we must not defeat their intentions by a construction which would bring about such results, and that too, where such construction is contended to be merely an inference from expressions used.

" We are therefore of opinion that the commission of the repsondent expired on the 1st of January 1839, and that the office then became vacant. If right in this view of the subject, then neither the act of the 25th June 1839, nor that of the 7th March 1840, could continue him in office. It would require a commission from the governor, ' by and with the advice and consent of the senate,' to enable him to perform any of the duties of the office, after that day.

" But the schedule requires that the legislature at its first session under the amended constitution, shall divide *the associate judges of the state.* It does not direct the legislature to divide a part of them into classes—and it is contended that the classification made in the act of 20th June 1839, neither classed all the judges (Samuel Yohe, of Northampton county, Joseph Seager, of Lehigh county, Thomas Jones of Chester county, and some others, who had been before the passage of that act, commissioned as associate judges, not being named therein,) nor classed those therein named, according to the true intent and meaning of the constitution. It was not only in the power of the legislature, subsequently to re-classify them, but it was their duty to do so—and hence the act of 7th March 1840 is not only constitutional, but proper.

" The power of the courts to declare acts of the legislature to be unconstitutional, has been repeatedly claimed, and has been in more

[Leib v. The Commonwealth.]

than one instance exercised. But all the decisions say, with great propriety, that this power should only be exercised by the courts, in clear and palpable cases. How far, too, in matters of *public legislation,* where warrants of contracts with individuals are not involved, one legislature can bind another from further legislation on the same subject, is also a grave question for determination. It is enough for us to say that there must be no reasonable doubt left on the minds of inferior courts, before they would exercise the power which they possess, to declare laws unconstitutional, or to hold a subsequent legislature bound by the acts of their predecessors in regard to such public legislation, so as not to have the power to modify and correct it. If the classification first made was not the proper one, then it is not such as the constitution contemplated, and except in very clear cases, that would be a subject for the exercise of legislative discretion, not of judicial determination.

" In the view we have taken of the subject, we are not required to pronounce the acts unconstitutional, if they even were so, as we think the case depends upon the terms of the constitution, and what was the manifest intention of the convention, as drawn from the instrument itself. And we think the construction adopted, is that which will secure for the judiciary of the country the greatest amount of public confidence.

" We therefore render judgment of ouster against the respondent; but to enable the parties to have the question decided by the supreme court, we will not award execution of the judgment, until an opportunity is afforded to the respondent, of removing the cause.

" It is considered by the court here, that Samuel D. Leib, Esquire, do not in any manner meddle or concern himself in and about the holding of or exercising the said office of associate judge of the court of common pleas, in and for the said county of Schuylkill, in the said information specified, in virtue of the supposed commission by him mentioned in his plea in bar aforesaid. But that the said Samuel D. Leib, Esquire, be absolutely forejudged and excluded from holding or exercising the said office, and that the said commonwealth recover costs taxed at," &c.

Errors assigned: 1. The court erred in deciding that the court of common pleas had jurisdiction of this case, and in overruling the plea to the jurisdiction.

2. The court erred in deciding that the writ was made returnable in term, and in overruling the plea in abatement, and in rendering judgment of *respondeas ouster.*

3. The court erred in sustaining the demurrer, and in rendering judgment of ouster against the respondent.

*Parry* and *Penrose,* for plaintiffs in error.

*Hughes* and *Johnson,* attorney-general, for the defendant in error.

IX.—T*

[Leib v. The Commonwealth.]

The opinion of the court was delivered by

SERGEANT, J.—This case comes before us by writ of error from the court of common pleas of the county of Schuylkill, and three errors have been assigned in this court in the proceedings and judgment below.

The first error assigned is, that the court below erred in deciding that the court of common pleas had jurisdiction of this case, and in overruling the plea to the jurisdiction.

The act of 14th of June 1836, after giving to the supreme court, in the first section, authority to issue writs of *quo warranto* in all cases in which the power had been before exercised, proceeds, in the second section, to specify the cases in which they may also be issued by the courts of common pleas concurrently with the supreme court. The first of these cases, and that which is supposed to embrace the power exercised in the present case, is as follows: " In case any person shall usurp, intrude into, or unlawfully hold or exercise any county or township office within the respective county." That is, as I understand it, the usurpation, intrusion, or exercise of the office must be within the respective county—the office must be a township or county office. It is contended that the office of associate judge of the court of common pleas is a county office, and that is the question for decision.

The judges of the courts of common pleas exercise a high and extensive portion of the judicial power of the state. In the counties generally throughout the commonwealth, their civil jurisdiction is unlimited in amount and in the nature of the suits. In addition to their original common law jurisdiction, they hear and decide appeals from the decisions of justices of the peace, and sit as courts of the last resort in certioraris to such justices. Many branches of equity jurisdiction are committed to them. By virtue of their offices, as judges of the courts of common pleas, they, by the constitution, compose the courts of quarter sessions and orphans' courts, and, with the register of wills, the registers' courts. They exercise large and various jurisdiction in cases of roads, turnpikes, canals, rail-roads, apprentice, pauper, insolvent and divorce causes, as well as others confided to them by the common law and acts of assembly. They are also justices of oyer and terminer and general jail delivery, under certain restrictions, and have now a limited jurisdiction in writs of *quo warranto*. They are nominated by the governor, and, by and with the advice and consent of the senate, appointed and commissioned by him. They receive their compensation from the treasury of the state. They are amenable to the legislature by impeachment or by address of two-thirds for their removal from office. Any two of them constitute a quorum; and these two may, by the constitution, be the associate judges in every instance except when they compose a court of oyer and terminer, and then the president must be one. In the exercise of the juris-

[Leib v. The Commonwealth.]

diction thus committed to them, it has ever been considered that in their powers and duties as judges, the president and his associates are placed on a footing of equality. While sitting as a court, they are on the same constitutional footing, and, where they act individually, have co-extensive authority. While sitting as a court, they are on the same constitutional footing; and, when they act individually, their powers are co-extensive within the range of their jurisdictions. This is the principle which was asserted in a case very memorable in the annals of this state, I mean the impeachment of Judge Addison in the year 1803, against whom the leading charge was, his interference with an associate judge, who endeavoured to address a grand jury; (see Trial of Judge Addison, 86, and 4 *Dall. Rep.* 225.) The doctrine of the common law is to the same purport, and is thus placed in 4 *Burns' Just.* 227: " It seemeth certain that the sessions hath no authority to amerce any justice for his non-attendance at the sessions, as the judges of assize may, for the absence of any such justice at the jail delivery. For it is a general rule, that *inter pares non est potestas:* it being reasonable rather to refer the punishment of persons in a judicial office, in relation to their behaviour in such office, to other judges of a superior station, than to those of the same rank with themselves. And, therefore, it seems to have been holden, that if a justice of the peace, who is not of the quorum, shall use such expressions towards another who is of the quorum, for which, if he were a private person, he might be committed or bound to his good behaviour, yet the sessions hath no authority to commit him or bind him to his good behaviour. And yet it seems to be agreed, that if a justice give just cause to any persons to demand the surety of the peace against him, he may be compelled, by any other justice, to find such security; for the public peace requires an immediate remedy in all such cases." There have been occasional laws under which a president of one district has been designated to hold courts in a county out of his own district, and his preference there has been made essential; but this is an exception to the general rule and usage.

If such be the character and grade of an associate judge of the court of common pleas under our constitution and laws, it seems to us his office cannot he considered as intended by the legislature to be embraced within the *quo warranto* jurisdiction given to that court by the act of 14th of June 1836, over persons exercising a county office. On the contrary, we think the court of common pleas of each county is to be considered as a state court, and the office of an associate judge of that court a state office. It is true the office is exercised within a county, but that circumstance does not make it a county office. The officers of the heads of departments, such as the secretary of the land office, surveyor general, auditor general, and state treasurer, are exercised at Harrisburg, within the county of Dauphin, yet they are clearly state not county

[Leib v. The Commonwealth.]

offices. It is also true, that the constitution and laws, in speaking of the courts of common pleas, term them at different times the courts of common pleas "in each county," "of each county," and " within each county." But the phraseology seems to refer to the geographical limit within which the duties of each are to be exercised, and not the nature or grade of the office. And what may illustrate this is, that in the constitution of 1776, chap. 2, sect. 24, they are denominated "courts of common pleas of the state of Pennsylvania;" and if the latter part of this expression has been dropped in later forms of government and laws, it has probably been for the sake of brevity; for the office has, under all our constitutions, remained essentially the same. In the 9th sect. of the schedule of the amended constitution of 1838, the term is, " associate judges of the state."

What then are the descriptions of offices which are comprehended within the words, "county and township offices?" It seems to me we have the explanation of these words by the legislature itself, in an act passed not long before the act of 14th June 1836, and composing part of the same revised code. The act of 14th April 1834, is in terms an act relating to counties and townships and *county and township officers.*" It first recognizes the existing counties— makes them and townships, bodies corporate—the corporate powers to be exercised by the *commissioners* and *supervisors*—gives directions where are to be kept the offices of the several *prothonotaries, clerks* of the courts of quarter sessions and orphans' courts, *registers* and *recorders,* and also of the *commissioners, auditors, treasurer* and *sheriff* of the several counties—provides for the elections of *auditors,* for their auditing the accounts of the *commissioners, treasurers, sheriffs* and *coroners* of each county. It is of this description of officers, that the class is composed who are considered by the legislature as county and township officers. Whether they embrace all or not, it is unnecessary to say: but certainly the description afforded by this law shows, that they embrace classes of officers inferior in grade and consequence to the associate judges of the court of common pleas.

Other reasons might be suggested of great weight and moment, founded upon a consideration of the propriety and policy of vesting such a jurisdiction in two of the judges of this court over a third: but it seems not necessary to dwell longer on this point. We are of opinion, that an associate judge of a court of common pleas is not a county officer within the meaning of the second section of the act of 14th June 1836, and therefore the court of common pleas of Schuylkill county, had not jurisdiction in the case before us.

The decision of this error would be sufficient to dispose of this case: but as both parties have requested us to give an opinion on the other points, and they have been fully argued before us, and as the matters involved are of great importance, and their decision will dispense with the necessity of another proceeding and another

[Leib v. The Commonwealth.]

argument on the same questions, we shall proceed to the other errors assigned.

2. The second error—that the court erred in deciding, that the writ was made returnable in term, and in overruling the plea in abatement, and in rendering judgment of respondeat ouster—we are of opinion is not sustained. The term continued by adjournment till the 17th April 1840, when the writ was returnable.

3. The third error assigned is, that the court erred in sustaining the demurrer and in rendering judgment of ouster against the defendant.

This brings up the principal question in the case, the right of the respondent to the office, and it depends upon the construction of the schedule of the amended constitution of 1838, and the two acts of assembly passed under it—the first on the 20th June 1839, and the second on the 7th March 1840. The clauses of the constitution itself were chiefly prospective: they were to apply after such an interval should have elapsed, as was necessary to ascertain that the amendments had been adopted, and if adopted, would give time for the new system to go into operation, and this time was fixed by the schedule for the first day of January 1839. The object of the schedule was, to provide for the intermediate time, and for the officers in being, whom it was the policy of the framers of the amended constitution not to remove at once from office, but to fix certain periods for their removal, which would be correspondent with the spirit of the changes about to be introduced in the tenure of office. The judges of the different courts of the state, were, by this schedule, distributed into four classes—and all of these, it is observable, are placed on a different footing, and the provisions in respect to them are distinct in their language and operation. By the first of the clauses on the subject, the judges of the supreme court are disposed of. They were comparatively few in number, and easily adjusted by the convention itself. They were, therefore, at once graded, and the rule for such grading was declared to be, the date of their commissions, and the judges to whom it related were to be those who might happen to be in office on the first day of January 1839, not at all regarding at what previous time their commissions had been issued. In the next clause are contained the presidents of the courts of common pleas and associate law judges of the first judicial district, who were more numerous and diversified. As to these, it was directed, that they should be taken as they existed "at the adoption of the amendments to the constitution," and that there might be no inconvenience felt from a sudden and general vacancy in the offices of such as had held for ten years and upwards, these were divided into two classes, the first class to embrace those whose commissions bore the oldest date. The remaining judges were to hold for ten years from given dates. The succeeding class were composed of recorders, and of mayors of criminal courts: and the provision as to them was, of those " now

in office"—the oldest in date to expire in the year 1841, and the others every two years thereafter, according to their respective dates.

When, however, the convention came to the fourth class of judges, consisting of the other associate judges of the state, they deemed it expedient to adopt another system in regard to them, entirely different from that which they had pursued in regard to the judges of the supreme court, the presidents and law associates of the first judicial district and the recorders and mayors of criminal courts: and that was not for themselves definitely to fix the classification, but to commit that matter to the legislature, with certain directions and limitations.    These associate judges were much more numerous than the others, being in number about one hundred.    Merely to direct that they should govern themselves in their term of holding by the dates of their commissions, would have imposed on these judges a difficult and perplexing task, to ascertain their comparative appointments at the office of the executive department.    To classify them by name would require more leisure and opportunity than the convention had, and besides, was a detail unfit for the business of a constitution.    The convention, therefore, determined to commit to the legislature, at their first session, the classification of these judges by name, so that they would be notified by a public act of the tenure of their offices, the convention contenting itself with marking out the principles on which such classification should be made by the legislature.    It is therefore provided in the 9th section of the schedule, as follows: " The legislature at its first session under the amended constitution, shall divide the other associate judges of the state into four classes.    The commissions of those of the first class shall expire on the 27th day of February 1840; of those of the second class on the 27th day of February 1841; of those of the third class on the 27th day of February 1842; and of those of the fourth class on the 27th day of February 1843.    The said classes, from the first to the fourth, shall be arranged according to the seniority of the commissions of the several judges."    And that there might be no difficulty made as to what was meant by the first general assembly spoken of here, and also in the 12th section of the schedule, the 4th section of the schedule enacts, that " The general assembly which shall convene in December 1838, shall continue its session as heretofore, notwithstanding the provision in the 11th section of the first article, (which requires the general assembly to meet on the 1st Tuesday of January in every year,) and shall, at all times, be regarded as the first general assembly under the amended constitution."

Accordingly, the legislature, at its first session under the amended constitution, passed the act of the 20th June 1839, classifying the associate judges under the foregoing authority.    That act recites the requisition of the constitution, and enacts, by section 1, that John Parker, and seventy-four others named therein, should con-

stitute the first class, whose commissions should expire on the 27th February 1840.   Section 2 enacts, that John Cummins and twenty-three others should constitute the second class, whose commissions should expire on the 27th February 1841.   Section 3 enacts, that Matthew Patton, and twenty-three others should constitute the third class, whose commissions should expire on the 27th February 1842.   And section 4 enacts, that George Smith and twenty-four others (amongst whom is the respondent Samuel D. Leib) should constitute the fourth class, whose commissions should expire on the 27th February 1843.   Under this act of assembly then the respondent, being placed by the legislature in the fourth class, had a right, by the terms of the act, to hold his office until the 27th February 1843, and if the question depended on this act alone, there would be no difficulty.

But at the subsequent session of the legislature of the year 1840, viz on the 7th of March 1840, another act was passed, changing this classification, and making a new one, by the terms of which the respondent was to be placed in the first class, and his commission was to expire on the 27th of February 1840; and the main question arises from the collision of these two acts of the legislature, rendering it necessary to determine which of them is to be the rule by which the associate judges are to be regulated in the tenure of their office.   The two acts are totally irreconcileable with each other, and one or the other must be the exclusive guide on the subject.

The act of the 7th of March 1840, is entitled an act supplementary to and explanatory of an act to classify the associate judges of the state.   It recites, that whereas the legislature did pass the act to which this act is a supplement on the 20th of June 1839, in pursuance of the provisions of the amended constitution, requiring that the legislature, at its first session under the same, should divide the associate judges of the state into four classes, to be arranged according to the seniority of their commissions: and whereas the legislature, in said act, made no distinction between the judges whose commissions bore date prior to the adoption of the amendments of the constitution and those whose commissions bore date subsequent to said adoption of said amendments: and whereas it is the true intent and meaning of the amended constitution, that the expiration of the commissions of the associate judges should be graded according to the priority of date at the adoption of the said amendments on the 9th of October 1838; therefore, section 1 enacts that Joseph S. Morrison, in the room of John Dickey and twenty-five others (amongst whom is the respondent, Samuel D. Leib) shall constitute the first class, whose commissions shall expire on the 27th day of February 1840.   Section 2 enacts that Jonathan Stevens and twenty-six others named, shall constitute the second class, whose commissions shall expire on the 27th day of February 1841.   Section 3 enacts that Joel Bishop and twenty-five others shall consti-

[Leib v. The Commonwealth.]

tute the third class, whose commissions shall expire on the 27th day of February 1842. And section 4 enacts that George Weiser and twenty-five others shall constitute the fourth class, whose commissions shall expire on the 27th day of February 1843.

The great point of difference between the classification of these two acts is this—that the act of the 20th of June 1839, arranges the associate judges according to the priority of the dates of their commissions, as they stood on the first January 1839: whereas the act of the 7th of March 1840 arranges them according to the priority of their dates on the 9th October 1838, the alleged period of the adoption of the constitution. The court below was of opinion that an associate judge, appointed by the governor alone, after the adoption of the amendments to the constitution, (as was the case of the respondent,) held his commission only until the 1st of January 1839; that it then expired, and that such judge could not be constitutionally classified at all by the legislature amongst the associate judges, by either of the acts in question.

Amidst so great a discordance of sentiment in those who have been called upon to express an opinion on the subject, we have considered with much attention all the different views presented, and we think that the court below erred in their opinion, that the commission of the respondent expired on the 1st of January 1839. The provision of the 9th section of the schedule, in relation to associate judges, is altogether different from that of the 7th section of the schedule, respecting president judges, on which the case of the Commonwealth *v.* Collins, 8 *Watts* 342, was decided. In the latter, the language is express, that the president judges who shall have held their commissions " at the adoption of the constitution," shall continue for specified periods. Of course there was no room for doubt that only such presidents were provided for, and those *appointed* after the adoption of the amended constitution, and before the 1st of January 1839, not being saved, fell with the former system of appointment. But there are no such words in the 9th section, relating to the associate judges, nor do we think it would be justifiable to introduce them into it. The 9th section of the schedule, in its terms, comprehends, generally, the other associate judges of the state, without restriction or qualification; and the difference of language manifests a difference of intention in the framers of the amended constitution. That no such general intention in the convention to exclude associate judges of this description from the right to continue on the same footing as those appointed before the adoption of the constitution, ought to be presumed, we think is apparent from the provision in regard to the judges of the supreme court. In this provision they have disregarded the time at which the commissions might have issued, whether before or after the adoption of the constitution, and looked only to the date of their commissions on the 1st of January 1839. If this was expressly allowed in regard to the judges of the supreme court, why should it be presumed, in

the absence of all enactment to that effect, to be meant to apply to the associate judges?

If this be so, then the respondent's name was properly introduced into the legislative acts, and the question is, whether the 1st of January 1839 is to be considered as the date when the commissions of the associate judges were to be graded, or the period of the adoption of the constitution? And we are of the opinion that it is the former. The reasons for this opinion are, that there is no express enactment in the 9th section of the schedule confining it to the adoption of the amended constitution, as is the case with regard to the president judges. It is a fair presumption, that if the convention had intended that period, they would have expressed it, as they have in other instances. These judges, therefore, fall within the 3d section of the schedule, which declares that the clauses, sections, and articles of the constitution which remain unaltered, shall continue to be construed and have effect as if the constitution had not been amended. There is no alteration made in respect to these associate judges, founded on the time of their appointment, whether before or after the adoption of the constitution. We must then refer to the 1st of January 1839, from which period the 2d section of the schedule declares, that the alterations and amendments in the constitution shall take effect, and from which time the new regulations in respect to them were to begin. We think that this date was intended to be preserved and regarded as to all matters not otherwise expressly provided for by the constitution or schedule, as was intimated in the opinion of this court, delivered by Mr. Justice Kennedy in The Commonwealth *v.* Collins, 8 *Watts* 342.

It has been urged on the argument here, as a conclusive reason why the time ought to be restricted to the adoption of the constitution, that as the classification was to be made by the first session of the general assembly under the amended constitution, and it was declared that should be the general assembly which should convene in 1838, which met on the 4th of December 1838, they could at once have proceeded to classify the judges without waiting for the 1st of January 1839. When, however, we look at the provisions of the amended constitution on this subject, this argument seems to fail; for the direction of the 4th section of the schedule is, that the general assembly which shall convene in December 1838, *shall continue its session as heretofore:* which is imperative upon it to continue beyond the 1st of January, and would enable it to make the classification after the 1st of January 1839, as well as before, provided it was during that first session; so that the proper time of making it must depend on the other provisions of the constitution.

Then, on comparing the classification made by the act of the 20th June 1839 with a list of the associate judges reported to the legislature in January 1839, by the secretary of the commonwealth, it appears that the classification embraces all those in office under com-

[Leib v. The Commonwealth.]

'missions issued before the 1st of January 1839, and classifies them according to the seniority of their commissions, as directed by the schedule.  It is alleged that there are mistakes in the spelling of some of the names, as Gebhart for Gearheart, &c.  But if it is apparent from other circumstances, as well as the similarity of sound, that the same person is meant, then, according to the established legal principle, the mere difference of spelling is not material.  In nearly all, it is presumed, the names are correct, and the classification appears to tally with the seniority of commissions, except that such of the associate judges in this list are omitted as were appointed after the 1st of January 1839; as for instance, Samuel Yohe, of Northampton county, Joseph Saeger, of Lehigh county, and Thomas Jones, of Chester county.  It is very clear, and is now conceded on the argument here, that these judges, being appointed after the amended constitution had gone into operation, by the governor, with the approval of the senate, they are entitled to hold for five years from the dates of their respective commissions, and could not be reduced in their term by any legislative act.

If then the legislature, at its first session under the amended constitution, and in accordance with its provisions, passed an act classifying the associate judges, it seems to us that the power vested in the legislature on the subject was exhausted and could not constitutionally be exercised or interfered with by a succeeding legislature.  It is not an ordinary act of legislation, in which one legislature has no power to bind its successors.  It is rather the discharge of a ministerial authority than the exercise of a legislative power; for, if the principles be given that associate judges in office on the 1st of January 1839 are to be included, and that they are to be divided into four classes, according to the seniority of their commissions, the performance of the duty is pretty much a mechanical act, requiring the exercise of no discretion.  And if even there were a discretion in the matter, it is given to the general assembly at its first session, and to none other.  It is a delegation to that specific body of a portion of the sovereign power of the people, entrusted by them to the convention, establishing a fundamental law permanent and indefeasible as the constitution itself, partaking of its eminent character, and intended to govern the conduct of the people and of the constituted authorities, as long as the judges remain to whom it is applicable.

There were obvious reasons why this classification should be made at the session of 1839.  One-fourth of these commissions were to expire on the 27th of February 1840; and it was not only expedient that these judges should know, some time beforehand, the duration of their offices, but if it were left till a subsequent session, as the general assembly was to commence its session on the 1st of January 1840, there might not even be time to get the bill through the legislature before one-fourth of the commissions should expire.  We have seen this occur in the act of the 7th of

[Leib v. The Commonwealth.]

March 1840, under which some of the associate judges could not be apprised of the expiration of their offices till after that event had actually taken place, and they had sat as judges in the meanwhile.

After the legislature, therefore, at its first session, had discharged the duty, another legislature could not change and remodel the classification, or interfere with it at all. To do so would have been inconsistent with the constitution, and fraught with inconvenience and hazard to the community. If a second legislature had this power, a third legislature would possess the same authority. The judges might then be changed at every succeeding session: those in office might be removed, and those who had been already removed, reinstated. Changes of this kind would produce confusion and uncertainty in matters of the highest moment to the community, calculated to cast reproach on republican government, weaken its influence, impair its strength and permanence, and lessen the affections of its citizens for our excellent institutions.

In choosing, therefore, between the act of the 20th of June 1839, and that passed by the succeeding legislature on the 7th of March 1840, making a new classification, we have no difficulty in deciding that the former must be considered as valid, and the latter as beyond the power of the legislature. The latter was not passed at the first session of the legislature under the amended constitution, as is expressly required by the schedule of the amended constitution; and even if such a power might, from necessity, have been exercised, in case the legislature, at its first session, had omitted to perform their duty, yet there has not been an omission by that first legislature to discharge the duty imposed upon it by the amended constitution. In the next place, the legislature of 1839 were, in our opinion, right in making no distinction between the judges whose commissions bore date prior to the adoption of the amendments of the constitution and those whose commissions bore date subsequent to that adoption—no such distinction being created, either expressly or by fair implication by the schedule, in its enactments respecting associate judges. And lastly, we think, that the expiration of the commissions of the associate judges would be graded according to the priority of date on the 1st of January 1839, after the amendments took effect. On these principles the first classification was made, and we concur with the legislature of 1839, in its construction of the constitution, and their duty under it.

The act of the 7th of March 1840, seems to contemplate the adoption of the constitution as the proper date, and that the classification is to be as of that date; and that it should reach down to the time of the passage of the act itself. Consequently it embraces several associate judges who were appointed after the first of January 1839, and after the amended constitution had taken effect, by the governor with the approbation of the senate, and reduces their constitutional terms of five years to much less than that term, ranking them according to the seniority of the commissions of the asso-

[Leib v. The Commonwealth.]

ciate judges in whose places they were appointed. Thus Thomas Jones, who was appointed on the 19th of February 1839, entitled to hold for five years from that date, is, by this act, arranged in the place of Cromwell Pearce, his predecessor, and his commission made to expire on the 27th of February 1841, and so of others. This, as has been stated, is admitted to be incorrect, and we are of opinion that these associate judges who were appointed after the first day of January 1839, under the amended constitution, are entitled to hold their offices for five years from the date of their commissions, and ought not to have been inserted in the classification by the legislature of 1840. If that be the case, then the tenures of other associate judges in this classification might be affected—for if some names are withdrawn from a class, those below may have to come higher up in the list than they stand at present; and so the whole classification be deranged.

On the best consideration we have been able to give to this important subject, we are of opinion that the classification of the associate judges made by the act of assembly of the 20th of June 1839, is the constitutional and binding classification under the schedule, and that according to which these judges ought to hold their commissions—and that the respondent being classed by that act among those whose commissions should expire on the 27th of February 1843, is entitled to hold and exercise his office till that time.

Judgment reversed.