## Commonwealth *ex rel.* Hepburn *against* Mann.

The Legislature have not the constitutional power to diminish the compensation of the President Judges of the Courts of Common Pleas fixed by law, during their continuance in office.

There is no other remedy for the recovery of a salary fixed by law and payable by the State treasurer than by writ of *mandamus*.

THE Commonwealth *ex relatione* Hon. Samuel Hepburn against Job Mann, Esq., State treasurer. This was a *mandamus* issued by this court to Job Mann, Esq., State treasurer, directing him to pay to the Hon. Samuel Hepburn, President Judge of the Ninth Judicial District, the amount of his salary fixed by the provisions of the Act 19th July 1839, or show cause to the contrary.

By the 5th art. 2d sec. of the Constitution of 1790, it is thus provided: " The Judges of the Supreme Court and the Presidents of the several courts of Common Pleas, shall, at stated times, receive for their services an adequate compensation to be fixed by law, which shall not be diminished during their continuance in

office, but they shall receive no fees or perquisites of office nor hold any other office of profit under the Commonwealth." This is the language also of the amended Constitution of 1838. By the Act of 13th April 1791, the salary of the President Judges was fixed at £500. By the Act of 4th April 1796, the salary was increased to $1600. By the Act of 19th July 1839, the salary was increased to $2000. By the Act of 14th January 1843, the Act of 1839 was repealed. On the 5th March 1839, the relator, Hon. Samuel Hepburn, was appointed.

The respondent in his answer assigned for causes why he refused to pay the salary fixed by the Act of the 19th July 1839. 1. That the Act was repealed by the Act of the 14th January 1843. 2. That by the Act of the 4th May 1841, there was assessed upon the salaries of Judges a tax of two per cent., which the State treasurer by the provisions of the law was directed to retain. To this answer the relator demurred; which gave rise to the question whether the Acts of the 18th July 1839, and 14th May 1841, as interpreted by the State treasurer, were constitutional.

*Watts* and *Alexander*, for the relator.
*Hamilton Alricks*, for the respondent.

The opinion of the Court was delivered by

Rogers, J.—The relator, Samuel Hepburn, petitions the court for a *mandamus* against Job Mann, Esq., State treasurer, commanding him to pay certain moneys in the petition specified. To this the respondent makes answer and admits the fact of his refusal, setting forth the reasons for his refusal to pay the amount claimed. To the answer of the respondent the relator demurs, which brings the case up for judgment before the court. The facts on which the question arises are these: On the 5th day of March 1839, the relator was duly appointed and commissioned President Judge of the Court of Common Pleas, &c., for the Ninth Judicial District, composed of the counties of Cumberland, Perry and Juniata. As such he was entitled to receive compensation for his services when appointed at the rate of $2000 per annum. This he has demanded from the treasurer, who refused to pay the same, claiming the right to retain from the petitioner part of his compensation at the rate of $400 per annum. The respondent also deducted from the amount of the salary or compensation a tax at the rate of two per cent. The reasons of the respondent are these: Because, on the 5th of March 1839, when the relator received his appointment, he was entitled to receive from the Commonwealth a salary only of $1600 in consideration of his services, by virtue of two several Acts of Assembly passed in the year 1791 and 1796; and although the Legislature of Pennsylvania, by an Act passed the 19th of July 1839, empowered the said Samuel Hepburn to receive an increase of $400 per annum as his salary, yet that this

[Commonwealth v. Mann.]

Act was subsequently, on the 14th of January 1843, repealed. The respondent denies that there is anything in the laws or constitution of Pennsylvania which prevents the Legislature from withdrawing a gratuitous increase of salary. He further insists, that as he has given bonds for the true and faithful performance of the trusts and duties enjoined and required by law to be performed by the State Treasurer, and as he has no authority to pay out any money until he has been empowered to do so by law, and as the law has been repealed which authorized payment of said additional salary, a mandamus ought not to issue directing him to pay the same. The respondent makes further answer, and says that the relator ought not to be allowed a mandamus requiring him to pay over to the said Samuel Hepburn the sum of $40.38 claimed by him, because he as treasurer was required and bound to retain out of his salary, in pursuance of the second section of the Act of the 11th of June 1840, entitled " An Act to create additional revenue to be applied towards the payment of interest and the extinguishment of the debts of the Commonwealth;" and also the 9th section of the Act of the 4th of May 1841, entitled "An Act to provide revenue to meet the demands on the treasury, and for other purposes;" inasmuch as, in the said last-mentioned Act, it is provided that in lieu of the taxes imposed by the Act of the 11th of June 1840, there shall be annually assessed upon salaries and emoluments of office, created or held by or under the *constitution* or laws of this Commonwealth, &c., where such salaries or emoluments of office exceed $200, a tax of two per cent. upon every dollar thereof above $200; and that it is further, by the said last-mentioned Act, provided " That when the salary is paid to any officer of this Commonwealth directly by the treasurer, he shall retain out of the said salary the amount imposed by the Act." The clause in the constitution on which the relator relies is in the following words, 5th article, 2d section: " The President Judges of the several Courts of Common Pleas shall, at stated times, receive for their services an adequate compensation, to be fixed by law, which shall not be diminished during their continuance in office."

The questions raised on the facts stated are of the most grave and important character, and as such they are entitled and have received the most anxious and attentive investigation of this court. They involve the construction of the fundamental principles of the government. It would not be difficult to give some plausible reason to evince that the respondent has misunderstood the intention of the Legislature in passing the Acts on which he relies for his justification. But as we believe he has given an honest interpretation of their meaning, we do not think proper to evade the question at issue, or to make the fruitless attempt to shelter ourselves under the well-founded rule of construction, that a retrospective effect is not to be given where it can be reasonably avoided without straining the words used in the statute. We will suppose, for

the sake of the argument, although our sincere respect for a co-ordinate branch of government makes us very reluctant to adopt the hypothesis, that the law in question contains a legislative exposition of the Constitution, and of that clause of it particularly to which reference has been made. It is our wish to meet the question fairly, openly, honestly and broadly. What is the true construction of the Constitution and of that clause in the Constitution contained in the second section of the 5th Article, and does the law or the construction put upon it by the treasurer impinge upon that provision, is the true matter at issue? "The President of the several Courts of Common Pleas shall at stated times receive for their services an adequate compensation *to be fixed* by law, which shall not be diminished during their continuance in office." These words are unambiguous, and are so plain that it seems to me very difficult to misapprehend them. Before, however, examining the section particularly, it will not be impertinent to give a short statement or history of the reasons this clause has been incorporated into the laws of England, and made a fundamental article of the Constitution of the State of Pennsylvania, and it is believed of most, if not all, the States in the confederacy. The history is given, not because of its novelty, for it is well known and well understood by every man of intelligence in the country, but because of its immediate and direct bearing on the points raised in this argument. The history of the human race has taught mankind by melancholy experience, that it is necessary in all governments, whether monarchial or republican, to strictly guard the rights of the subject from the injustice of the crown, and the citizen from the injustice and gradual encroachments of those to whom they are compelled to intrust the management of their affairs, whether a legislative body, or whatever mode they may choose to adopt. Experience has also taught us the useful lesson, that there is no more effectual way of destroying the liberties of the people, than by gradual encroachments under colour of law, and that no better instrument could be employed for that purpose, than a venal, time-serving, timid and subservient judiciary. This melancholy truth was completely exemplified in the tyrannical and corrupt reigns of Charles II. and James II., not to mention other notorious examples, which will readily occur to any person even slightly versed in the history of the people from whom we have taken our laws and the principles of our government. Fully convinced of this truth by recent examples, after the revolution of 1688, by the English act of settlement of the 12 and 13 William III., it was declared, that the salaries of the Judges should be ascertained and established; and by the statute of 1 George III., the salaries of the Judges were absolutely secured to them during the continuance of their commissions. And thus the law stood in England when the people of the United States ordained and established their present Constitution. The great and incorruptible men who

formed the glorious fabric of our liberties, completely conversant with the history of the past, and looking with prophetic eye to the future, to avoid the rocks and quicksands which had caused the shipwreck of so many other governments, based as was erroneously supposed on indestructible principles, divided the powers of the government into three independent co-ordinate branches, the legislative power, (I use the words of the Constitution), the executive power, and the judicial power : and for the purpose of protecting the latter, which was the weakest and most exposed to attack, from the encroachments of the former, they established this fundamental principle.   They are independent and co-ordinate, because distinct rights, powers and privileges are assigned to them by the Constitution.   Each is entitled to the free, unbiassed, uninfluenced and independent exercise of all their rights, powers and privileges in as ample extent as the Constitution allows.

That the Constitution of the United States was the model of the State Constitution established in 1790, is apparent.   For the same reasons the framers of that Constitution, who were inferior only to the convention which framed the Constitution of the general government, adopted the same classification of the general powers of government, and also adopted the same means to carry their design into effect.   The plan adopted in each was, that the Judges should hold their offices during good behaviour, and they should receive, at stated times, for their services, a compensation which was not to be diminished during their continuance in office.   In the former it applies to all, whether Judges of the Supreme or inferior courts; in the latter, the clause as to compensation to the Judges of the Supreme Court and the several Courts of Common Pleas only.   The words are also somewhat variant.   In the former the Judges are at stated times to receive for their services a compensation which shall not be diminished during their continuance in office.   In the latter, the Judges of the Supreme Court and the president of the several Courts of Common Pleas shall, at stated times, receive for their services an *adequate compensation to be fixed by law*, which shall not be diminished during their continuance in office.   In all other respects the provisions are identical; although it cannot escape observation that there is an increased anxiety manifested by the latter to secure the independence of the judiciary by an injunction that there should be an *adequate* compensation for their services.   There is a striking difference, as Chancellor KENT very justly remarks, in favour of the American Constitution, inasmuch as in England the *compensation*, as well as the term of office is within the reach of the repealing power of Parliament; but in the National Government it constitutes the supreme fundamental law, unalterable except by an amendment of the Constitution.   So it will not escape observation that the Constitution of Pennsylvania is, in this respect, an improvement on its great model.   That one of the primary objects of the sages

[Commonwealth v. Mann.]

who formed the Constitution was to secure the independence of the judiciary, cannot be too much insisted on; and for this purpose I shall be excused for inserting in this opinion copious extracts from the earliest and ablest exposition of the principles of the Constitution—I mean the admirable series of essays from the pen of those distinguished sages and patriots Madison, Hamilton and Jay, under the title of the Federalist. Speaking of that clause in the Constitution, 2d section and 5th article, they make use of this language. — Next to permanency in office, nothing can contribute more to the independence of the Judges than a fixed provision for their support. The remark made in relation to the president is equally applicable here. In the general course of human nature, *a power over a man's subsistence amounts to a power over his will.* And we can never hope to see realized in practice the complete separation of the judicial from the legislative power in any system which leaves the former dependent for pecuniary resource on occasional grants of the latter. The enlightened friends of good government in every State have seen cause to lament the want of precise and explicit precautions in the State Constitutions on this head. Some of these, indeed, have declared that permanent salaries should be established for the Judges; but the experiment has, in some instances, shown that such expressions are not sufficiently definite to preclude legislative evasions. Something still more positive and unequivocal has been evinced to be requisite. The plan of the convention accordingly has provided that the Judges of the United States " shall at stated times receive for their services a compensation which shall not be *diminished* during their continuance in office." With what consummate wisdom those parts have been adopted and improved in the Constitution of 1790, and subsequently adopted without alteration in the amended Constitution! They have not ordered a permanent salary simply, but they have directed an *adequate* salary to be provided, thereby securing, as far as human laws could do, the independence of that invaluable and indispensable branch of government.

If, then, these views be correct, and that they are cannot be reasonably questioned, it follows that any construction, come from what quarter it may, which tends to defeat or nullify this fundamental and vital principle of constitutional law, must be unsound. And now let us examine the grounds of the respondents' return. A distinction is attempted between Judges appointed after and before the Act of 19th July 1839, the Act by which the Legislature increased the salary of the relator. Whilst it is admitted that the former are entitled to receive their increased salary, it is denied that the latter are in the same situation. The propriety of the distinction I confess myself unable to perceive. The sum of the argument is, that because the Legislature thought proper, by way of gratuity as it is called, to add to the salary of the relator, they have the right, notwithstanding the constitutional

[Commonwealth v. Mann.]

prohibition, to take it away. That the power that can create can likewise destroy. But this, it is obvious, is an unsound position, as it by no means follows that because, for reasons which will be hereafter stated, they thought it right and just to increase the compensation of the relator, they are at liberty to withdraw it under the pretext that as it was a gratuity, they were not constrained from resuming their bounty when they deemed it expedient. But to test the correctness of the argument, let us inquire what is the inevitable result of the position assumed by the respondent? If admitted in the extent claimed, and it is not susceptible of limitation, does it not lead to the entire frustration of the very object which the framers of the Constitution had in view, and which they have guarded with such sedulous care? If it be correct that the power over a man's subsistence amounts to a power over his will, what instrument better calculated to give the Legislature an undue and improper influence over the judicial department of the government, than by an address in the manner proposed to their hopes as well as their fears. As, for example, take the case in hand. Here the Legislature have assumed the control of the relator, so far as he could be influenced by the possession or loss of $400 a year. Cases may occur when, with the aid of the additional salary, it may be merely a decent support of himself and family. A power therefore to reduce it may, it is obvious, be equivalent to a power to deprive him of office altogether. And the same observation is applicable to the class of Judges who are placed in a similar situation by the repeal of the Act of 19th July. Besides, this instrument of coercion or intimidation may be used as particular occasions may require, and to any extent, by the power which holds the purse-strings. The effect of it is impossible for any person to divine. It is not intentional disrespect to a co-ordinate branch, nor to the judiciary, to suppose it possible that cases may arise, where, to effect a favourite object of legislative ambition, or to gratify the vindictive feelings occasioned by the phrenzy and madness of party, a successful resort may be had, by such means, to the judicial tribunals of the country. That cases of the kind will not be frequent I am ready to admit; but that they are *possible*, and have taken place in other lands, if not in this pure and enlightened Commonwealth, will hardly be denied by those who have taken the trouble to look into the history of the times, and particularly that period of history where the judicial departments were subject to the temptations which must necessarily arise from a dependent condition. It is enough for me, that the framers of our admirable Constitution have so thought, and have endeavoured to provide against its recurrence. Thoroughly acquainted with the human heart, deeply versed in history, and taking warning from the numerous examples it affords of the insidious approaches of tyranny, they have surrounded this branch with every protection which might, as they supposed and intended,

[Commonwealth v. Mann.]

secure them from the encroachments of the other branches of government.  The Constitution itself supposes that our representatives may abuse their trusts, and provides against such a contingency as well as human wisdom can provide.  It is a consolation to every lover of his country's welfare, that insidious or open attacks upon the Constitution cannot ultimately succeed, unless through the corruption of the people themselves.  And when the time occurs when assaults on the Constitution are regarded with indifference, it will be an easy step to take refuge in the arms of tyranny.  They will deserve to be slaves, because they are unworthy of the blessings of liberty.  The standard of good behaviour (as is said in the Federalist), for the continuance in office of the judicial magistracy, and, it may be added, their permanent and adequate compensation, is certainly one of the most valuable improvements in the practice of government.  In a monarchy, it is an excellent barrier to the despotism of the prince; in a republic, it is a no less excellent barrier to the encroachments and oppressions of the representative body.  And it is the best expedient which can be devised in any government, to secure a steady, upright and impartial administration of the laws.  Whoever attentively considers the different departments of power must perceive, that in a government in which they are separated from each other, the judiciary, from the nature of its functions, will always be the least dangerous to the political rights of the constitution; because it will be least in a capacity to annoy or injure them.  The executive not only dispenses the honours, but holds the sword of the community.  The Legislature not only commands the purse, but prescribes the rules by which the duties and rights of every citizen are to be regulated.  The judiciary, on the contrary, has no influence over either the sword or the purse; no direction of either the strength or of the wealth of society, and can take no active resolution whatever.  It may be truly said to have neither *force* nor *will*, but merely judgment, and to be ultimately dependent upon the aid of the executive arm for the efficacious exercise even of this faculty.  This simple view of the matter suggests several important consequences.  It proves incontestably, that the judiciary is, beyond comparison, the weakest of the three departments of power; that it can never attack with success either of the other two, and that *all possible care is requisite to enable it to defend itself against their attacks.*  It equally proves, that though individual oppression may now and then proceed from courts of justice, the general liberty of the people can never be endangered from that quarter.  I mean, so long as the judiciary remains truly distinct from both the legislative and executive.  For I agree " that there is no liberty, if the power of judging be not separated from the legislative and executive powers."

It proves in the last place, that as liberty can have nothing to fear from the judiciary alone, but would have everything to fear

from its union with either of the other departments; that as all the effects of such an union must ensue from a dependence of the former on the latter, notwithstanding a nominal and apparent separation; that as from the natural feebleness of the judiciary it is in continual jeopardy of being overpowered, awed or influenced by its co-ordinate branches; that as nothing can contribute so much to its firmness and independence, as permanency in office, to which must be added, as has been already said, *a fixed and adequate support*, this quality may, therefore, be justly regarded as an indispensable ingredient in its constitution, and in a great measure as the citadel of the public justice and the public security. If then the courts of justice are to be considered as the bulwarks of a limited constitution against legislative encroachments, this consideration will afford a strong argument for the permanent tenure of judicial offices, and for a fixed and invariable compensation, incapable of diminution; since nothing will contribute so much as this to that independent spirit in the Judges, which must be essential to the faithful performance of so arduous a duty. This independence of the Judges is equally requisite to guard the Constitution and rights of individuals, from the effects of those ill humours which the arts of designing men, or the influence of particular conjunctures, sometimes disseminate among the people themselves; and which, although they speedily give place to better information and more deliberate reflection, have a tendency in the mean time to occasion dangerous innovations in the government, and serious oppressions of the minor party in the community. If, by the remarks already made, I have succeeded in establishing the position that the complete independence of the judiciary is a fundamental principle of the Constitution, designed mainly for the protection of public and private rights, and that the construction put upon that clause of the Constitution aims a fatal blow at it, then may I not here safely rest the argument? For no course of reasoning can render the proposition plainer that the pretension of the respondent is at war with the spirit of the Constitution. It is not only contrary to the spirit, but it is directly in the teeth of the letter of the Constitution, and this it is now my purpose to show.

The Constitution provides, and in this respect the Constitution of 1790 and the amended Constitution are identical, " That the Judges of the Supreme Court and the President Judges of the several Courts of Common Pleas, shall at stated times, receive for their services an adequate compensation, *to be* fixed by law, which shall not be diminished during their continuance in office: but they shall receive no fees or perquisites of office, nor hold any other office of profit under this Commonwealth." Now what is meant by an adequate compensation to be fixed by law? No other interpretation can be given to it, than that the compensation is to depend upon some future legislative enactment. The

[Commonwealth v. Mann.]

Legislature are to determine under their constitutional responsibility, from time to time, what constitutes an adequate compensation: but when the compensation is fixed, although it may be increased, they are expressly prohibited from decreasing it during the continuance in office. And the reasons for this distinction, and they are most satisfactory, are these: "The fluctuations in the value of money, the state of society, rendered a fixed rate of compensation in the Constitution inadmissible. What might be extravagant to-day, might in half a century become penurious and inadequate. It was, therefore, necessary to leave it to the discretion of the Legislature to vary its provisions in conformity to the variations in circumstances; yet under such circumstances as to put it out of the power of that body to change the condition of the individual for the worse. A man may then be sure of the ground upon which he stands, and can never be deterred from his duty by the apprehension of being placed in a less eligible situation. The clause which has been quoted, combines both advantages. The salaries of judicial offices may, from time to time, be altered, as occasion may require, yet so as never to lessen the allowance with which any particular Judge comes into office, in respect to him. It will be observed, that a difference has been made by the Convention between the compensation of the Governor and the Judges. That of the former can neither be increased nor diminished. That of the latter can only "not be diminished." Taking this as the sense of the Convention which framed the Constitution, it is obvious that it never entered into their minds to suppose that the Legislature had any constitutional authority to diminish the salary of a Judge, whether fixed before, or increased after his appointment, and that such an act of legislative interference was never in their contemplation. For such an hypothesis would be, as I trust I have shown, against the spirit as well as the letter of that instrument. It is said, that this power may be abused for the benefit of legislative favourites, which, on the contrary supposition, subsequent Legislatures cannot correct. But this was an evil, if it be one, which must have been foreseen, and it appears did not alarm the Convention, nor has subsequent experience evinced the necessity of any such precaution; and at any rate, they were too wise to attempt to avoid a contingent evil, which from the nature of things would not often happen, by running into another, in their estimation at least, of such transcendent importance and magnitude, jeoparding the independence and integrity of a co-ordinate branch of the government. It must readily occur, on the slightest reflection, that if the Convention intended to give the clause in question the limited signification contended for, how easy it would have been to put that intention beyond the reach of doubt or cavil, by a slight alteration of the language used. By superadding a few words even, which would not have destroyed the beauty of the language, all difficulty would

[Commonwealth v. Mann.]

have been effectually prevented. But we cannot attribute this intention to those great men on a doubtful inference, inasmuch as, in our judgment, it would materially impair, if not totally destroy the value of the provision itself. It would be suicidal to the object so steadily kept in view by the framers of the Constitution. If, then, I have been, as I flatter myself I have, successful in evincing that the complete and entire independence of the judiciary of the other branches, is essential and so esteemed by the Convention, to the preservation of liberty and the principles of good government, and that the construction of the Constitution for which the respondent contends would jeopard the rights of the community and endanger the welfare of the citizen, and that there is nothing in the Constitution, but the direct contrary, to favour that construction, there is an end of the argument. It may be a matter of surprise, that so much pains is taken to establish a position which cannot, with any prospect of success, be denied. My apology is, that when conclusively proved, there must be an end of the case. A position which weakens, even if it does not destroy, the fundamental principles of the Constitution, the work of the people themselves, the charter of our liberties, cannot expect to be favoured or receive the slightest countenance in a court of justice.

But, the vital importance of the question involved in this issue, will be my excuse for tracing this matter a little further in relation to a similar clause in the amended Constitution. It must be recollected, that the tenure of office of the Judges of the Supreme Court, and of the several Courts of Common Pleas, under the Constitution of 1790, was during good behaviour, but under the amended Constitution it is changed, so that the Judges of the Supreme Court hold their offices for the term of fifteen, and the President Judges for the term of ten years. This change, which, it must be admitted, was in its nature radical, was strenuously resisted, on the ground, that it impaired the independence of the judiciary, and struck a fatal blow at that fundamental feature in the government; and it was further urged in debate, that it would be difficult, if not impossible, to procure persons competent to fill such offices on the terms proposed. The advocates of the change, however, while they admitted the necessity of preserving that feature in the Constitution inviolate, denied the consequences deduced from the alteration. They met the other proposition by stating, that the objection could and would be obviated by an increased compensation to the incumbents. I assert this to have been the course of argument, because it was notorious at the time, and because a resort to the debates in the Convention will fully sustain the assertion. And, perhaps, it will not be going too far to say, that these assurances and expectations contributed greatly to allay the fears of many, and were instrumental in securing the subsequent approbation of the people to the amended Constitution. That it had the intended effect in the Convention itself, there is

v. — 2 K *

[Commonwealth v. Mann.]

reason to believe. And hence the phraseology used; " The Judges of the Supreme Court, and the President of the several Courts of Common Pleas, shall, at stated times, receive for their services an adequate compensation, TO BE fixed by law, which shall not be diminished during their continuance in office." Why use the words in the future tense, if subsequent legislative action were not intended? The Judges were then in the enjoyment of a salary already fixed, and there was no necessity for the use of such language as existed in the Constitution of 1790, where they had not been fixed, and where the officers themselves were afterwards to be appointed under the Constitution. That this is the light in which the Legislature viewed it, there is no reason to doubt, for we find them at the next session carrying into effect the pledge made by the members of the Convention and by the people in their sovereign capacity, by the increase of salary, which is now the subject of controversy. In this respect, they followed in the footsteps of the Legislature which assembled after the adoption of the Constitution of 1790, who on the 13th of April 1791, in pursuance of the Constitutional provision, fixed the salary at £500, which on the 4th of April 1796, was increased to the sum of $1600 per annum. The relator, be it observed, was appointed after the adoption of the amended Constitution, and it may be, although I do not undertake to assert the fact to be so, that in his acceptance of the office, he was induced by a reasonable expectation and belief, that the Legislature would faithfully redeem the plighted faith of the people, and the pledges that were made on the floor of the Convention. That the Legislature was influenced in the enactment of 19th of July by such considerations, is rendered probable, by the fact that some members of the Convention who were members that year, were foremost among the enlightened advocates of the proposed increase of salary. Indeed, the law then passed, was neither more nor less than the execution of a Constitutional injunction. It may also add some force to the argument, that some of the Judges, the members of the Supreme Court, for example, held their offices not by virtue of a commission from the Governor, but directly from the people themselves, who, by the subsequent ratification of the amended Constitution, adopted the work of the Convention as their own. Those offices, as is well known, were changed from the tenure of good behaviour to a term of three, six, nine, twelve and fifteen years. And for this reason it was, (as it may be reasonably presumed), that their salaries were raised, and that the increase, unlike other cases, was made to commence from the 1st of January preceding the passage of the Act, the time when their offices commenced under the amended Constitution. I mean, of course, those persons, of whom the relator was one, who were in office at the time, and who were appointed afterwards, and before the Act was repealed. For I would not wish to be understood as denying the right to prescribe

[Commonwealth v. Mann.]

rules to govern all future cases. For although the Constitution directs that the compensation must be adequate, they are the exclusive judges on that head. They must determine what amounts to an adequate compensation. It is a sound rule which should never be departed·from, except from overwhelming necessity, that neither branch of the government should claim or attempt the exercise of a doubtful power. But, the power in question is so far from being a conceded power, or necessarily implied, that I confess, from the most attentive and anxious consideration which it has been my duty to give to it, I have been unable to discover a trace of it in the Constitution, which is the paramount law, or the least justification of the authority which has been assumed. So far from being granted, it is denied, in language which it would puzzle the most ingenious to make more comprehensive and plain. An attempt of a similar kind was made in the case of *The Commonwealth* v. *Leib*, (9 *Watts* 200). That was a classification of the Associate Judges, by the Act of Assembly of the 20th of June 1839, made in pursuance of the Constitution, which was ruled to be so fixed, that the Legislature of 1840 had no power over the subject. Justice Sergeant says, that after the Legislature had discharged the duty, another Legislature could not change and remodel the classification, or interfere with it at all. To do so, would have been inconsistent with the Constitution, and fraught with inconvenience and hazard to the community. If a second Legislature has this power, a third Legislature would possess the same authority. In analogy to this case, we confidently submit to the people the question of right, which has been assumed by a subsequent Legislature, to diminish the salary so fixed and determined by the only proper and legitimate authority.

Next, of the power claimed to tax the salary of the Judge. The respondent justifies the retention of the sum of $40.38, by virtue of two acts of the Legislature, one passed the 11th of June 1840, entitled " An Act to create additional revenue to be applied towards the payment of interest, and the extinguishment of the debts of the Commonwealth;" the other passed the 4th of May 1841, entitled " An Act to provide revenue to meet the demands of the treasury, and for other purposes." In the last Act, it is provided that in lieu of the taxes imposed by the Act of the 11th of June 1840, there shall be annually assessed upon *salaries* or emoluments of office, created or held by or under the constitution or laws of this Commonwealth, &c., where such salaries or emoluments exceed $200, a tax of *two* per cent. upon every dollar thereof above $200, &c. And it is further provided, " That when the salary is paid to any officer of this Commonwealth directly by the treasurer, he shall retain out of the salary the amount imposed by the Act." The first Act omits the word constitution, which is carefully inserted in the second Act; so that if we desired to evade meeting the question, it is rendered impossible to do so. Nay, we

are not without reason to believe that the Legislature were desirous of referring the decision of these momentous questions to the judicial department of government, to whose province, in all doubtful cases, if this case can be called one of that denomination, it more peculiarly belongs. The two branches of the Legislature differed as to the power to repeal the laws increasing the salaries. The House of Representatives passed an amendment limiting the operation of the Act to judges thereafter to be appointed, in which the Senate non-concurred; a committee of conference was appointed, and it was expressly understood, as we have from the most unquestionable authority, to let the ~~equal~~ pass in its present shape, and the question of constitutionality to be decided by the judiciary. But be this as it may, there is no disguising the fact that the Legislature, in words, the purport of which cannot be mistaken, have undertaken, although not *eo nomine*, to tax the salary of the judges appointed under the Constitution. We cannot complain that there is anything insidious in this. It is open, palpable, and, let me add, without disrespect, (unless purposely done for the reasons suggested), daring and bold. I say daring and bold, because, in our apprehension at least, it sets at naught the *declared will of the people themselves,* unequivocally and clearly expressed in the Constitution. That it is the duty of the Legislature to provide revenue to meet the demands on the treasury, to pay the interest on and extinguish the public debt, will not be denied by us. And, let me add, there are no persons in the community, I will venture to say, who will more willingly and cheerfully contribute their full proportion to such objects. But while we, in their name, unhesitatingly agree to this, we most respectfully deny the right of the Legislature to effect this meritorious object by trampling under foot the provisions of the Constitution, intended for the protection of the community, and the rights of the individual citizens of the State. Most of the remarks which have been already made, apply with increased force to this branch of the subject. The former struck at part, while this aims a fatal blow at the whole compensation allowed to this branch of the government. It is truly and emphatically the assertion of a power over a man's subsistence, and, by consequence, a power over his will; and if the attempt proves successful, what becomes of the independence of the judiciary, which the people have been so anxious to preserve from the insidious or open attacks of the other branches of government? The tax is now two per cent.; but what security is there that it may not be increased *ad libitum* to thirty, fifty per cent.? What bond have we that it may not engulph the whole? If there is anything true in law or common sense, it is that you are not at liberty to do indirectly, what you are prohibited from doing directly. The people themselves, for the wisest reasons, have thought proper to withdraw from taxation the salaries of a particular class of citizens. That it is withdrawn from

[Commonwealth v. Mann.]

taxation, is a necessary and inevitable implication or inference from the whole tenor of the instrument, because, without this restraint upon the legislative power, it is evident the clause itself would be worthless. For, under the pretence of it, the work of destruction can surely go on without the possibility of stopping its progress. If the people have thought it right to set limits to legislative power, of what can they complain? They are but servants of the people, as well as other branches of government, and there is certainly at least as much necessity to keep them within the legitimate sphere, as the other branches. As well may they complain of the want of authority to impose an impost duty, and therefore usurp it because it would be very convenient at the conjuncture to raise a revenue for the purposes of the government by indirect means. It is a sufficient answer to this pretension, as it would be to the one I have mentioned, that it is not the object of taxation, and therefore you must resort to other means to supply your wants. We are far from attributing to the Legislature a settled design to invade the just and constitutional rights of a co-ordinate branch. It is sufficient, however, that this is the effect of their legislation, and, although innocent in them, the time may come when the example thus set, if acquiesced in, will be used to accomplish designs which charity itself cannot so readily excuse. The salary itself is taxed, and that tax is deducted at the treasury, so that the relator, instead of receiving the amount of the compensation fixed by law, receives a sum less by the amount deducted at the treasury in the shape of a tax; in other words, instead of receiving $2000 per annum, he receives $1960. It is therefore a mockery, adding insult to injury, to tell him he is in the enjoyment of a salary which has not been diminished during his continuance in office. Twist it and turn it as you may, it is in vain to disguise the fact that in this attempt there is a plain and palpable infringement of our constitutional charter. It may be asked, has not the Legislature full power to tax her citizens? To this we answer, that is not denied. Taxation is an incident of sovereign power which acknowledges no limits except the discretion of those who use it, unless it be those objects of taxation which for wise reasons have been withdrawn from these general powers. The property of a judge, his income, whether derived from this or any other source, we admit is a proper subject of taxation. His security will then consist in being placed on the same footing with other citizens, and an abuse of them by any will be speedily corrected. Of this the relator does not complain; but he does complain that he, with others, is selected as a special object of taxation, contrary to the charter which he has solemnly sworn to support. On this point, the case of *M'Cullough* v. *The State of Maryland* (4 *Wheat.* 430) is full of instruction, and in a great measure sustains the views I have endeavoured to support. And for the same purpose may be cited the case of *Dobbin* v. *The Commissioners of Erie,* (16 *Peters*

[Commonwealth v. Mann.]

435). That case establishes that though taxation is a sacred right, essential to the existence of government, and that the right of legislation is co-extensive with the incident, and attaches upon all persons and property within the jurisdiction, yet there may be limitations to the right either by express or implied prohibitions in the Constitution; and where a law is passed taxing an object coming fairly within such prohibition, it is unconstitutional and void. It was the case of a captain of the United States revenue cutter on the Erie station in Pennsylvania, who was rated and assessed for county taxes as an officer of the United States, for his office. The Supreme Court of the United States held that he was not liable to be rated and assessed for his office under the United States for county rates and levies, because it was not a proper object of taxation. It will be observed that the case is not put on the footing of a contract. That question is settled in *The Commonwealth* v. *Bacon*, (6 *Serg. & Rawle* 322), where it was ruled that an ordinance of the Councils, reducing the salary of the mayor of the city of Philadelphia, after the commencement of his term of office, was valid. The broad ground was taken on the part of the mayor, that the city Councils could not legally diminish the salary of the mayor during his continuance in office. This position they endeavored to support on the principle of contracts, which, by the Constitution, the Legislature itself cannot impair. But the court being of opinion that it did not partake of the nature of a contract, ruled the point against him. If the salaries of judges and their title to office could be put on the ground of contract, then a most grievous wrong has been done to them by the people, by the reduction of a tenure during good behaviour, to a tenure for a term of years. The point that it is a contract, or partakes of the nature of a contract, will not bear the test of examination. Moral obligations on this head are nothing to the purpose. We deal with legal rights.

A doubt has been expressed in the argument of the respondent's counsel, (and it assumed the shape of a doubt merely), that the court has no right to declare an Act of the Legislature unconstitutional. Whatever scruples may have existed in the minds of some as to this power, it has now ceased to be an open question. This power has been repeatedly asserted by the courts of the United States, and of this State, and has been most cheerfully acquiesced in by the people. It is a remarkable fact, in all the discussions which took place in the late convention on the frame of our government, although this assertion of right on the part of the judicial department of the government was well understood, not a word was said or a syllable whispered, which indicated a wish to abridge or limit it in the slightest degree. It is certain the amended Constitution contains no restriction whatever. As it is not my intention (for it would be an unprofitable discussion) to go into an extended argument on this point, I cannot do better than to quote

the appropriate language of Judge Wilson, a member of the convention which framed the Constitution of 1790. Speaking of the Constitution of the United States, and the same may be said with equal truth of the Constitution of Pennsylvania, he says: " The legislative authority is subject to another control, besides that arising from natural and revealed law; it is subjected to the control arising from the Constitution. From the Constitution, the legislative department, as well as every other part of government, derives its power; by the Constitution, the legislative, as well as every other department, must be directed; in the Constitution, no alteration by the Legislature can be made or authorized. In our system of jurisprudence, these positions appear to be incontrovertible. The Constitution is the supreme law of the land; to that supreme power, every other power must be inferior or subordinate. Now, let us suppose the Legislature should pass an Act manifestly repugnant to some part of the Constitution; and that the operation and validity of both should come regularly in question before a court forming a portion of the judicial department. In that department the ' judicial power is vested' by the people who ' ordained and established' the Constitution. The business and design of the judicial power is to administer justice according to the laws of the land. According to two contradictory rules, justice cannot, in the nature of things, possibly be administered. One of them must of necessity give place to the other. But, according to our supposition, it comes regularly before the court for its decision on their operation and validity. It is the right and it is the duty of the court to decide upon them; its decision must be made, for justice must be administered according to the law of the land. When the question occurs, what is the law of the land? it must also decide this question. In what manner is this question to be decided? The answer seems to be an easy one. The supreme power of the State has given one rule; a subordinate power has given a contradictory rule: the former is the law of the land; as a necessary consequence, the latter is void and has no operation. In this manner it is the right and it is the duty of a court of justice, under the Constitution, to decide. This is the necessary result of the distribution of power made by the Constitution between the legislative and judicial departments. The same Constitution is the supreme law of both. If that Constitution be infringed by one, it is no reason that the infringement should be abetted, though it is a strong reason that it should be discountenanced and declared void by the other. The effects of this salutary regulation, necessarily resulting from the Constitution, are great and illustrious. In consequence of it, the bounds of the legislative power, *a power the most apt to overleap its bounds,* are not only distinctly marked in the system itself, but effectual and permanent provision is made that every transgression of these bounds shall be adjudged and rendered vain and fruitless. What a noble guard

[Commonwealth v. Mann.]

against legislative despotism! This regulation is far from throwing any disparagement upon the legislative authority of the State. It does not confer upon the judicial department a power superior in its general nature to that of the Legislature; but it confers upon it in particular instances, and for particular purposes, the power of declaring and enforcing the superior power of the Constitution —the supreme law of the land." This regulation, when considered properly, is viewed in a favourable light by the Legislature itself. "It has been objected," said a learned member of the House of Representatives of the United States, Mr. Elias Boudinot, in a debate on the floor of Congress, " that by adopting the bill before us we expose the measure to be considered and defeated by the judiciary of the United States, who may adjudge it to be contrary to the Constitution, and therefore void, and not lend their aid to carry it into execution. This gives me no uneasiness. I am so far from controverting this right in the judiciary, that it is my boast and my confidence. It leads me to a greater decision on all subjects of a constitutional nature, when I reflect that if, from inattention, want of precision, or any other defect, I should do wrong, there is a power in the government which can constitutionally prevent the operation of a wrong measure from affecting my constituents. I am legislating for a nation, and for thousands yet unborn; and it is the glory of the Constitution that there is a remedy for the failures even of the Legislature itself." In addition, I put to any rational man this question : — What was the Supreme Court to do in the case of _Commonwealth_ v. _Leib_, already cited ? They had to choose between the Act of the 20th of June 1839, and that passed by the succeeding Legislature on the 17th of March 1840. In deciding that the former was valid, they necessarily ruled that the latter was beyond the power of the Legislature. To escape from this determination was impossible, even if it had been desired.

We are fully sensible of the delicate situation in which the Judges of this court are placed, but it is not of our seeking, and we should be recreant to our duty, if, when it is demanded by a citizen whose rights have been invaded, we should shrink from its performance. We should in all probability receive, most certainly we should richly merit, the contempt of the Legislature itself. We wish it to be distinctly understood that no claim is put in for judicial irresponsibility ; we acknowledge in its fullest extent the constitutional responsibility of Judges for an abuse of their high functions, among which the greatest that could be committed would be a base betrayal of trust in refusing to interpose to prevent injustice whether arising from a wilful, deliberate and wicked invasion of the Constitution, or from what we believe to have been a mistaken construction of legislative authority. As the people, who are the fountain of all power, have in their wisdom distributed the functions of government into their co-ordinate branches — the legisla-

[Commonwealth v. Mann.]

tive power, the executive power, and the judicial power — it is necessary that each should respect the just rights of the others, and abstain, as far as practicable, from the exercise of all doubtful authority. In this way, and in this way only, can the harmony of our system be preserved. In this mode, in the language of the Constitution of the United States, we shall best promote the general welfare and secure the blessings of liberty to ourselves and our posterity.

And here let me further remark, (without pretending to any great merit for the prediction), that whenever the liberty of this people is overthrown, all the forms of the government will be anxiously and carefully preserved. While the spirit of liberty has fled, its semblance will still remain. Of this truth the fall of the Roman Republic is a memorable and a useful example. Although the most infamous despotism was established which the world has ever seen, yet, to all outward appearances, the government continued the same. But the limits of a judicial opinion will not allow me to pursue this theme by the citation of numerous other examples full of instructive and salutary warning. And let me also, (without intending the slightest disrespect), recall the attention of the intelligent people of the Commonwealth to the frightful despotism which raged without control in a neighbouring country, and at a recent period, under the name and with the apparent sanction of the legislative body. The page of history teems with examples which incontestably prove that no more convenient or effectual instrument can be devised for the success of unhallowed ambition than a corrupt legislature and a subservient judiciary. To prevent the evils which would inevitably result from the overthrow of the government, the equilibrium established by the Constitution must be preserved, and this can only be done by meeting *on the* threshold the first attempt at encroachment, whether arising from design, inattention or mistake, come from what branch of the government it may.

It remains only to notice the question that has been raised as to the power of the court to issue a *mandamus* against the treasurer. As to the power of the court to issue a *mandamus* where the treasurer without claim of right refuses to pay a sum of money to which a citizen is justly entitled, there cannot be a shadow of doubt; for without this writ the injured party would be without remedy; an action would not lie, or if it would, it would be an inadequate remedy. In this matter the treasurer is a ministerial officer. For example, would it admit of question that this remedy would be an appropriate one, if the respondent had refused to pay not only part, but the whole of the relator's salary? Unless an efficacious remedy is provided, miserable indeed would be the situation of the holders of office. The judiciary, instead of being dependent on the legislative power, would be dependent on the treasurer. The proposition thus broadly stated cannot be sus-

[Commonwealth v. Mann.]

tained for one moment.   Is there, then, any peculiarity in the case which exempts the respondent from the operations of the ordinary rule, is the next inquiry?   It is said he has given bond to the Commonwealth for the true and faithful performance of the trusts and duties enjoined and required by law to be performed by the State treasurer in the 40th section of the Act of 20th March 1811; that he has no authority to pay out any money until he has been empowered to do so by law, (or on warrants drawn by the executive), and that the law has been repealed which authorized the payment of the additional salary to the relator. · But this is a mistaken view of the case, for I deny that the law giving the additional salary, so far as respects the relator and all others similarly situated, is repealed.   It has been my aim in the preceding remarks to prove that this is beyond the constitutional powers of the Legislature.   A statute may be in force for one purpose, after it is repealed for all other purposes.   Thus in *Rex* v. *Loxdale and others*, (1 *Burrow* 447), it is decided, that " where there are different statutes *in pari materia*, though made at different times *or even expired*, and not referring to each · other, they shall be taken and construed together as one system, and as explanatory of each other."   So in *Church* v. *Crook*, (3 *Mass*. 21), it is stated that to discover the true meaning of a statute it is the duty of the court to consider other statutes made *in pari materia*, whether they are repealed or unrepealed.   As the Constitution is the paramount law of the land, it follows that if the repeal of the statute be contrary to the supreme law, the repealing Act is void, and the original Act remains in full force and virtue.   By payment to the relator, the treasurer will truly and faithfully perform the trusts and duties enjoined on him by law in pursuance of the obligation imposed on him by his bond.   In conclusion, I must be permitted to say, that not a shadow of blame attaches to the excellent officer against whom this remedy is sought.   It was not his duty to take the responsibility of undertaking to construe an Act of the Legislature against what he might reasonably suppose was their declared intention.   That duty devolves upon the judicial department; and fully convinced of these incontrovertible truths, written by the finger of the people themselves, we feel ourselves constrained to declare that the construction put upon the Act of the 14th January 1843, repealing the Act of the 19th July 1839 is contrary to the Constitution; and that the Act of the 11th June 1840, or the construction put upon it, so far as it affects the salary of the relator, is unconstitutional and void.

Judgment on demurrer for the relator, and peremptory *mandamus* awarded.