Critchfield, J.,
of Wayne county, sitting by assignment of Chief Justice Nichols.
This is a proceeding in mandamus instituted in this court by the relators who are all the judges of the .court of common pleas in Cuyahoga county, Ohio, with the exception of one judge, who is sick and not in the state.
The petition asks for a writ of mandamus compelling the defendant, John A. Zangerle, as auditor of Cuyahoga county to issue a warrant on the country treasury in favor of each of said relators for a certain sum of money alleged to be due them as part of their salary as common pleas judges now due and payable.
To this petition the defendant has entered his appearance *486 and through the prosecuting attorney of the county has filed his demurrer to the petition:
1. That the petition does not state facts sufficient in law to constitute a cause of action.
2. That said petition does not state facts sufficient to entitle relators to a writ of mandamus or any relief as prayed for.
In the oral arguments based on this demurrer, it was agreed 'by the attorneys on both sides that the real question at issue in this ease is, whether or not a certain increase of salary for common pleas judges, authorized by the Legislature by a bill enacted on the 4th day of February, 1920, and operative on the 24th of May, 1920, was due and payable to all the judges of the common pleas court within the limits of its terms, or whether it was only payable to those who should be hereafter elected or appointed common pleas judges in said state. No other question is raised or intended to be raised by the demurrer of the defendant, and no other defect is desired to be relied upon if any should exist, such as joinder of parties or the specific time when said sum should be payable, if it applies to present judges, that is, whether it should be payable every three months out of the county treasury or oftener.
The act in question which became an operating law on May 24, 1920, was an act to amend Sections 1529, 2251, 2252, 2253 of the General Code, to provide for an increase in salaries for the judges of the supreme court, court of appeals, common pleas and superior courts of the state, and for their expenses in the performance of their official duties. Section 2251 of this act provides among other things:
“That judges of the common pleas and superior courts shall receive as annual salaries, each, $3,000.”
Section 2252 of this act provides that,
‘ ‘ In addition to the salary allowed by Section 2251, each judge of the court of common pleas and of the superior court, shall *487 receive an annual compensation equal to twenty-five dollars for each, one thousand population not in excess of one hundred and twenty thousand, of the county in which he resided when elected or appointed, as ascertained by the federal census next preceding his assuming the duties of such office. In no case shall any additional salary be more than five thousand dollars and such additional salary shall be paid quarterly from the treasury of said county upon the warrant of the county auditor.”
The relators claim in their petition that under and by virtue of the terms of this act of the Legislature, passed Feb. 4, 1920, they are entitled in addition to the salary received from the state of $3,000, an annual compensation to be paid by Cuyahoga county of $5,000, and that the auditor of the county has refused to certify or allow any compensation to be paid 'by the county in excess of $3,000. Hence relators bring their action in mandamus. The true purpose, as I have stated, is to test whether this salary is due to every judge now holding office, or only to such judges as will be elected or appointed after said 24th day of May. The Constitution of the state of Ohio is involved in this discussion.
Section 14, Article IY, of the present Constitution of Ohio reads as follows:
“The judges of the supreme court, and of the court of common pleas shall, at stated times, receive for their services such compensation as may be provided by law, which shall not be diminished or increased during their term of office; but they shall receive no fees or perquisites, nor hold any other office of profit or trust, under the authority of this state or the United States. All votes for either of them, for any elective office, except a judicial office, under the authority of this state, given by the General Assembly or the people, shall be void.”
Under our system of American jurisprudence a Constitution is the organic law of the state as distinguished from the statutes made or enacted by the Legislature acting under and limited by the order of things thus constituted; or, in other words, under the authority conferred by the Constitution.
*488 By “construction” or “interpretation” of the provisions of the Constitution, or a statute, is generally meant that intelligent reading, with explanation such as defines the meaning of the words used.
Cooley on Constitutional Limitations, 7th Ed. page 70, says:
‘ ‘ The. deficiencies of human language are such that, if written instruments were.always prepared carefully by persons skilled in the use of words, we should still expect to find their meaning often drawn in question or, at least, to meet with difficulties in their practical application. When the draftsmen are careless or incompetent, these difficulties are greatly increased.”
Interpretation is ordinarily the art of finding out the true sense embodied in any form of words, or the sense which the. author intended to convey while construction may be said to be the drawing of conclusions respecting subjects that lie beyond the direct expressions of the text, from elements known from and given in the text; conclusions which are the spirit, though not within the letter of the text.
“In construing a statute, it is the duty of the court to give effect to the legislative intent. True, the intent of the Legislature is to be determined from the language employed, and when that language clearly expresses the intent of the law-making body, it should be given its plain, ordinary meaning, for it is not a question what the law-making body intended to enact, but rather the meaning of that which it did enact. Where, however, the meaning is doubtful the history of legislation on the subject may be considered in connection with the object, purpose and language of the law, in order to arrive at its true meaning.” Erie R. R. Co. v. Steinberg, 94 O. S., 203; Slingluff et al v. Weaver et al, 66 O. S., 621.
The rule of construction and interpretation as applied to constitutions, is practically the same, with perhaps this exception; a constitution does not derive its force wholly from the convention which framed it,' but from the people who adopted and ratified it, and it must be presumed that the people accepted the words and language used in the sense most obvious to the *489 common understanding, and ratified the instrument with the understanding that this was the sense designed to be conveyed by the framers of the instrument. This being true, the proceedings of a constitutional convention may perhaps be less conclusive of intent than are legislative proceedings. However, the history of calling the constitutional convention, and the causes which lead to it, and the debates or discussions before the people at the time of the election of the delegates or members of the convention are undoubtedly quite instructive as well as what was said by the members of the convention at the time of the adoption of the Constitution itself or of the particular section under consideration. Or, in other words, it is always proper to inquire what was the mischief intended or designed to be remedied, as well as the purpose sought to be accomplished by any particular provision found in a state Constitution; and to that end, it is entirely proper and often quite illuminating to examine the proceedings of the convention which framed the instrument. As was said in Cass v. Dillon, 2 O. S., 607:
“We can not treat the Constitution as a series of mathematical axioms from which none but infallible deductions are •admissible; nor can we yield our. assent to every deduction that may be logically drawn from any one of its generalities. We regard it as a law, subject to the imperfections of legislation in the construction of which as in all other laws the intent of the law giver must, if possible, prevail.
It may be said that statutes have not the same flexity and rigidity necessarily incident to constitutional provisions, but, nevertheless, the rules of construction or interpretation, with the exceptions pointed out, are practically identical, and this construction and interpretation depends in large measure on the common law and prior constitutional provisions, which are superseded by the provisions or sections under consideration. These rules of construction or interpretation, as gathered from the best authorities so far as the present discussion is concerned, may be thus briefly summarized:
*490 First. Constitutional provisions are to be construed, not according to their letter but according to the object, purpose, and intention the members of the constitutional convention and the people had'in view in framing and adopting them.
'Second. Consideration of the constitutional provision superseded by the constitutional section or provision under consideration with a view to a determination of the defect or mischief, if any, against which the superseded section did not provide.
Third. Is the superseding section a remedy against a then existing evil to the state, and if so, the reason of the remedy ?
Fourth. Other provisions of the Constitution, in pari materia, must be given due and careful consideration.
Fifth. "Where a constitutional provision is general, as relating to a class, everything necessary to make the provision effectual is implied.
Sixth. A later provision repeals or supersedes an earlier only so far as they are repugnant. If they may stand together it will not be presumed the convention, in framing, or the people, in adopting, the later provision intended to change in material respects the organic law.
Seventh. There is a presumption against what is positively inconvenient and unreasonable.
It may be said, in passing, that the “rule of reason” of which much has recently been written and said, .especially in federal decisions, is based upon the last given rule of construction.
The rule of reason must never be lost sight of, in construction or interpretation of a constitutional provision or of a statute; and that simply means that a reasonable construction is what the provisions of the statute under consideration demands, and should receive.
“And the real question is, what the people meant, and not how meaningless their words can be made, by the application of arbitrary rules.” Cooley, Const. Lim., 95.
*491 It may therefore he profitable to refer to the constitutional provision of 1802, relating to the term of office and salaries of judges. Section 8 of Article III, of that Constitution reads as follows:
“The judges of the supreme court, the presidents and the associate judges of the courts of common pleas, shall be appointed by a joint ballot of both houses of the General Assembly and shall hold their offices for the term of seven years, if so ]ong they behave well. The judges of the supreme court and the presidents of the courts of common pleas shall, at stated times receive for their services an adequate compensation to be fixed by law which shall not be diminished during their continuance in office; but they shall receive no fees or perquisites of office, nor hold any other office of profit or trust under the authority of this state or the United States.”
It will be noticed by the provisions of this section, that the judges of the supreme court, and the presidents of the court of common pleas shall, at stated times, receive cm adequate compensation for their services, the same to be fixed by law. It will also be noticed that the judges of the court of common pleas under this section of the Constitution were appointed by joint ballot of both houses of the General Assembly and were to hold their offices for the term of seven years, provided, “if so long they behave well.” Judges were not then elected by the people, but were appointed by the Legislature elected by the whole body, and were essentially state officers, if a judge may be so denominated.
Section 19 of Article I, of the Constitution of 1802, reads as follows:
“The Legislature of this state shall not allow the following officers of government greater annual salaries than as follows; until the year one thousand eight hundred and eight, to-wit: the governor, not more than one thousand dollars; the judges of the supreme court, not more than one thousand dollars each; the presidents of the courts of common pleas, not more than eight hundred dollars each; the secretary of state, not more than five hundred dollars; the auditor of public accounts not *492 more than seven hundred and fifty dollars; the treasurer, not more than four hundred and fifty dollars; no member of the Legislature shall receive more than two dollars per day, during his attendance on the Legislature, nor more for every twenty-five miles he shall travel in going to, and returning from, the General Assembly. ’ ’
It will be noticed by this section that the common pleas judges, or rather, the presidents of the courts of common pleas, are classed with and placed in the same category with the governor, judges of the supreme court, the secretary of state, the auditor of public accounts, the state treasurer and members of the Legislature; or, in other words, their salaries were to be paid exclusively from the state treasury.
A consideration of the various speeches of the members of the constitutional convention are very interesting and illuminating, and while it is almost impossible to give the remarks that they made, the intention was that the Legislature of' the state should provide adequate compensation for its judges. One of the speakers speaks of times when the dollar might fluctuate in value, when one dollar might buy five times as much as other times, or five dollars would only buy what one dollar would at another time, and stated if at any time five dollars should not be worth • any more than one dollar is now, the whole thing could be regulated by law. And the idea runs all through the constitutional debates of the convention of 1802 and 1851, leaving it to the Legislature to fix the amount as the exegeneies of the occasion should require, to meet the needs and necessities of the value of money as it would appear from time to time, evidently having in mind the cheapness of the American dollar on February 4, 1920. An inspection of the constitutional debates on the section of the Constitution under consideration discloses this fact as I have stated, as mentioned by different members, that the value of money differed so that it would not be wise for the Constitution to fix the salary, but that it should be left to the Legislature which had more mobile powers and could act more rapidly in case of great financial depre *493 ciation or inflation of money, salaries could 'be increased when the occasion necessitated it, and it surely did not mean that they should wait until the beginning of another term, as by that time the necessity for the increase of salary might have disappeared and the dollar by that time restored to its former and normal value. One member of the constitutional convention of 1851 stated, “if left to itself, that body (the Legislature), will exercise its discretion, and it would be far better left to them to increase or diminish, as the exegencies of the times seem to indicate.” This language is plain and unambiguous. It does not mean that the salary of a judge should remain fixed and unchanged for seven years, as the term, was fixed in the Constitution of 1802, but unquestionably means that the Legislature was to be left wholly free to increase or diminish salaries as the exegencies of the time seem to indicate.
This view was strictly according to the rule of reason. Any other is inconsistent with public interest and the common welfare. The supreme court of Pennsylvania was the only court in which this question arose in clearly analogous cases.. The ease of Commonwealth v. Mann, 5 W. & S., 403, is squarely in point or in pari pasu. This case was decided in 1843.
The relator, a judge, in taking office was entitled to receive from the state an annual salary of $1,600 and this was subsequently increased $400, which increase was afterwards repealed by the Legislature. The relator demanded the increase, and brought an action in mandamus to enforce his demand. At the time the ease was decided the Constitution provided judges should be paid “an adequate compensation, to be fixed by law, which shall not be diminished during their continuance in office.” Rogers, J., who rendered the opinion did not base his action exclusively upon this phrase of the Constitution of 1838, but founded it upon those great fundamental principles upon which the whole or entire structure of constitutional government is founded. Among other things the learned judge said:
“If by the remarks already made I have succeeded in establishing the position that a complete independence of the judi *494 eiary is a fundamental principle of the Constitution, designed mainly for the protection of public and private rights, and that the construction put upon that clause of the Constitution aims a fatal blow at it, then may I not here safely rest the argument ? For no course of reasoning can render the proposition plainer, that the contention of the respondent is at war with the Constitution.”
In this case the court held that the complete independence of the judiciary is necessarily a fundamental principle of the Constitution and that this fundamental principle was designed mainly for the protection of the public and private rights and that any other construction would be a fatal blow at this fundamental principle.
The old maxim, “Reason is the soul of the law, for when reason ceases, the law itself ceases” (1 Blak. Com., 701), should be always borne in mind in judicial interpretation.
In Wheeler v. Philadelphia, 77 Pa., 388, Paxson, J., said:
“We will not presume that the framers of that instrument (the Constitution), or the people who ratified it, intended that the machinery of their state government should be so bolted and riveted down by fundamental law, as to be unable to move and perform its necessary functions.”
The reason why the members of the convention who framed the Constitution of 1851 (Ohio) intended that judges should receive 'an adequate compensation, is well expressed by the court in Com. v. Mathues, 210 Pa., 401:
“The judiciary are peculiar unto themselves, an independent and high class of officials, elected for exceeding long terms, giving their entire time to the public service and distinguished from other officials in the fact that upon taking office they are deprived by law and custom from deriving income from prior and usual sources, being confined to their salaries alone for subsistence with the always present public necessity of keeping up and supporting their absolute independence and dignity, and this, not so much for the benefit of the judge, as for the good of society as a whole.”
*495 A common pleas judge in Ohio can not practice law or derive an income “from prior and usual sources,” i. e., from the practice of his profession.
Section 14, Article IV, expressly provides that these judges “shall receive no fees or perquisites, nor hold any other office of profit or trust under the authority of this state or the United States,” and the statutes prevent them from the practice of their profession. (Section 170, G-. C.)
Possibly a common pleas judge may derive income by en- ' tering the fields of trade and commerce, but by so doing, his absolute independence as a judge would be destroyed, as he would be subject to the indirect influence and pressure of his patrons in such fields as he may enter to seek trade and business.
The case of Com. v. Mathues, 210 Pa., 372, above cited, is the ablest, the most thorough and exhaustive exposition of the questions involved that has come under our observation. This ease arose out of an act of the Legislature of Pennsylvania, of April 14, 1903, increasing the salaries of judges. The Constitution of Pennsylvania of 1873 relating to the judiciary and salary of judges, differs from the Constitution of 1790 and 1838 in the substitution of the words, “which shall 'be fixed by law,” for the words “to be fixed by law,” and secondly, in striking out the words “which shall not be diminished during their continuance in office.” The court, in speaking of these changes say (p. 394):
“We do not see that there is any real difference in the change of the words above noted, and we will show hereafter that the striking out of the second phrase above quoted works no difference in the law. The other change made is not relevant to the consideration of the question .before us.”
What the court had in mind was, that the striking out of the words “which shall not be diminished during their continuance in office,” “worked no difference in the law,” for the reason that the Constitution provided for an adequate compensation.
Section 18, Article V, of the Pennsylvania Constitution is in the following words:
*496 “The judges of the supreme court and the judges of the several courts of common pleas and all other judges required to be learned in the law shall, at stated times, receive for their services an adequate compensation, which shall be fixed by law and paid 'by the state. They shall receive no other compensation, fees or perquisites of office for their services from any source nor hold any other office of profit under the United States, this state or any other state.”
With the exception of the words “an adequate compensation,” the section does not differ materially from Section 14 of Article IV of the Ohio Constitution. It will be noticed that the salaries shall be fixed by law; that is, fixed or permanently established and restrained from change during the term for which the judge is elected. The following parts of the syllabus are quoted:
“The act of April 14, 1903, Pa. L., 175, entitled ‘An act to fix the salaries of the judges of the supreme court, judges of the superior court, judges of the court of common pleas, and the judges of the orphan’s court, applies to all judges in commission at the time of the approval of the act, and not merely to those thereafter to be commissioned.
“An act of assembly relating to the salaries of judges will not be construed so as to give judges upon the same bench, engaged in the performance of exactly the same judicial functions, different compensation, those senior in commission receiving smaller and those junior, larger compensations unless such construction is the unavoidable result of the clear and plain man-' date of the Constitution. ■
“Article V, Section 18, of the Constitution of 1874, which provides that judges ‘shall at stated times receive for their services an adequate compensation, which shall be fixed by law and paid by the state,’ unequivocally expresses the mandate for the adequate compensation of the judges, and negatives any restriction in regard to any increase thereof. It gives beyond question or doubt the power, in case of inadequacy to increase judicial compensation ito adequate amounts, during incumbency. ’ ’
“The provisions of Article III, Section 13, of the Constitution, that ‘no law shall extend the term of any public officer, or increase his salary or emoluments after his election or appoint *497 ment. ’ has no application to the judiciary, and can not be- read into the judiciary article, which refers to a separate and coordinate branch of the government.
‘ ‘ Judges are not public officers within the generic words used in Section 13, Article III of the Constitution.
“The word ‘adequate’ as used in the judiciary article means ‘fully equal to the requirement or occasion, commensurate.’’ It does not mean ‘average’ or ‘graduation.’ ”
The entire reasoning upon . which these conclusions are founded is 'based upon the words “an adequate compensation.” If the members of the Ohio convention of 1851 struck out these words as they appeared in the provisions of the Constitution of 1802 for the sole reason that they were manifestly superfluous and unnecessary as fundamental law the Legislature, by clear intendment being charged, in the interest of the public welfare, with the duty of providing an adequate compensation for judges, then, obviously, Section 14, Article IV, impliedly provides for such compensation and if, at any time, the compensation so provided proves inadequate, not fully equal to a judge’s proper requirements or commensurate with the necessities of his position and absolute independence as a judicial officer, it is the province and duty of the Legislature to provide such adequate compensation.
That our contention is fundamentally sound, is indicated by .the fact that the provision of Section 14, Article IV, that judges’ compensation shall not be diminished during their term of office, has proven wholly ineffectual to prevent a condition the Constitution was designed to obviate. Neither statutes nor constitutions can hinder or prevent the operation of the immutable laws governing values, money, production or competition. There are many things influencing the conditions that determine the value of money which need not be discussed at this time. It is sufficient for our present purpose to say that the value of money is its purchasing powder, or the commodities or essential things that can be exchanged for it. Measured by this standard, it will be admitted by all that the value of a dollar *498 today, compared with the value of a dollar in 1913, has decreased at least sixty per cent.
The functions of modern civilized government are threefold, legislative, judicial and administrative. To attain a high state of social organization, the complete co-operation of the three functions is absolutely essential. To secure the blessings of freedom and promote the common welfare, it must be presumed that the General Assembly, in enacting laws, is acting within the powers conferred by the Constitution.
In Palmer & Crawford v. Tingle, 55 O. S., 440, Judge Burkett says:
“As the Constitution must be regarded as consistent with itself throughout, it must be presumed that the laws to be passed by the General Assembly under the powers conferred by that instrument are to be such as will secure the blessings of freedom and promote our common welfare.”
It is the duty of the judiciary to give such a construction to the Constitution as will make it consistent with itself, and as will harmonize and give effect to all of its various provisions. In Senior v. Ratterman, 44 O. S., 661, Judge Spear says on page 678:
“A law is .uniform in its operation when every person who is brought within the relations and circumstances provided for is alike affected by the law.”
In this case the Supreme Court took into consideration the constitutional debates and the petitions which had been submitted to the constitutional convention by the people. It will be seen that the Legislature, in its efforts to promote the common welfare, inexorably driven by public necessity, and in response to public opinion has been forced time and time again to ignore the rule of uniformity in matters affecting the judiciary in the creating of various courts in the cities — superior courts and municipal courts — and fixing their salaries to be paid; the length of their term of office, and the fact that their *499 salary was to ¡be paid from the county or by the city council of the particular city or county affected. Some of these statutes passed the Supreme Court on questions of their constitutionality. It is very interesting to read the history of these different acts of the Legislature in which the rule of uniformity has been absolutely ignored, as well as the fact that laws must be of uniform application throughout the state.
According to the Pennsylvania Constitution, Section 13 of Article III, provides: “No law shall extend the term of any public officer or increase or diminish his salary or emoluments after his election or appointment.”
In the case of Commissioners v. Mathues, 210 Pa., 372 already quoted, the Supreme Court of Pennsylvania says that this provision of their Constitution has no application to the judiciary and can not be read into the judiciary article which refers to a separate and co-ordinate branch of the government. Judges are not public officers within the generic term used in that section. And the same may be said here, that judges are not officers within the generic terms used in Section 20, Article II, of the Ohio Constitution. The laws affecting the judiciary stand by themselves and seem to have a different basis than that of any other officer. Generally speaking, judges are public officers but not such public officers as are intended to be governed by that section of the Constitution. It must be borne in mind that, at the time of the adoption of the Constitution of 1851, the compensation of judges was paid by the state, and such compensation has been paid by the state, and is still paid by the state, ever since 1802, except in certain counties where it has been found that the volume of business is so great that members of the bar could not be induced to accept positions on the bench at the compensation provided by the state.
It seems to me in considering this section of the Constitution in which it says that the salary shall not be increased or diminished, refers, if it refers at all to the judiciary, to the salary paid by the state. That was the only thing in the minds of the framers of the Constitution at the time it was made in *500 1802 and 1851 as no judge received any compensation from any other source than at the state treasury. Necessity had forced an additional compensation to judges. Those sitting in large cities where business is so much greater than in agricultural or rural counties, must surely be paid more money or the bench would degenerate and the members holding that great and honored position of judge would be the least equipped and the least qualified for that great position.
As I stated a while back, there have been a great many statutes passed creating additional courts in cities throughout the state, providing for compensation to be paid by either the city council or county commissioners. Most of these statutes contain the provision that the salary of these courts shall not be increased or diminished during the judge’s term of office. In some instances these statutes do not contain this provision. The act of the General Assembly of February 4, 1920, now under consideration contains no such provision and by clear intendment the Legislature meant that the additional salary provided for should be available to all judges in office when the act was passed.
It may be laid down as a general proposition and it will not be controverted or denied, that when the Legislature or Constitution created an office and prescribed the duties of a person that is to fill that office and the performance of these duties require all the time of such person, and such person is not permitted to practice his- profession or 'business in which he was engaged at the time of his election, the law implies, necessarily so, that an adequate compensation is to be paid for such services even though the Constitution or the statute is wholly silent upon the question of compensation.
In 1850 the population of the state of Ohio was less than two millions, and in 1920 two counties in the state null have practically, or very nearly that population. Industrial conditions have changed marvelously and industries have become diversified and multiplied enormously. The state is no longer strictly speaking, an agricultural state. A large portion of its *501 population is urban, and follows industrial pursuits. In 1850 no man dreamed, or could possibly conceive, that cities of the size of Cleveland would spring into existence. No man then had any conception of the advance in science and in art, invention, and intellectual development that was about to take place. The elevator and sewing machine were then unknown. The transmission of the human voice by other means than speaking face to face were not even dreamed of. A few fiction writers spoke about riding under the sea, and some poet wrote about a flying machine. The world has advanced more in the development of science and art and inventions and in all those things which have annihilated time and space and distance within the last 50 years, than in all the world’s history put together. New York City is the largest aggregation of people in the world and about 400 years old. Times have changed, circumstances have changed. Members of our constitutional conventions as they then existed in the past were dealing with conditions as then existed and were trying to meet the needs of supply and demand of the people with laws as they conceived them to be at that time.
I think the plain intendment and meaning of Section 14 of Article IV of the Constitution that the compensation of the supreme court and common pleas judges shall not be diminished or increased during their term of office meant that the compensation paid by the state shall not be increased during the term of office of these judges. The tendency of our times is to return to the people more of their power, more home rule, more right to determine conditions under which their people wish to live, consistent with the good of the whole. If the people of a community desire to pay their judges more for more work nobody should say them nay. It is not conceivable that the framers of our Constitution ever had in view, desire or intention to deprive a community from paying to its public servants in its judiciary branch of the government such salary as would compensate them for their services. Neither could it be contemplated that the framers of the Constitution intended to *502 pay one judge $6,000 for five years, while a judge elected a few months after him should receive $8,000 for nearly the same period of time, performing the same labor and amount of labor.
In an endeavor and desire to enforce the law it has been enunciated by our Supreme Court time and again that all laws of a general nature shall have uniform operation throughout the state. It is an impossibility in the judiciary. It never has obtained and never can. The judiciary of the state of Ohio is underpaid now and always has been. The state of New York pays its judges as high as $17,500 annually. Pennsylvania from $10,000 to $15,000 and many other states are equally as considerate of the public welfare. The state of Ohio is one of the least in its pay. There is no reason for this, as Ohio has produced some of the most distinguished lawyers that any state in the Union has produced, and our opinions of the Supreme Court rank high in the councils of the other states. There is no question but that compensation is largely the controlling factor in determining the character and efficiency of the public officers. A cheap instrumentality, whether animate or inanimate, eventually proves costly and expensive. President McKinley once said, “cheap means shoddy.” If the legislative policy were to reduce the salary of its officers, how long would it be until the judiciary was known as a bunch of shoddy lawyers.
To sum up, therefore, I hold as follows:
1. That Section 14, Article IV, impliedly provides that judges shall be paid an adequate compensation.
2. That Section 6 of Article IV of the Constitution is so repugnant to Section 14 of the same article, that the two sections can not be reconciled, so as to stand together, unless this eonstruction prevails, or, that Section 6 which was adopted over sixty years after Section 14, by implication repeals Section 14, or renders its provisions nugatory and unenforeible.
3. The framers of the Constitution of 1851 in formulating Section 14, Article IV, meant and intended its provision as to compensation to refer and apply only to the compensation *503 paid, by the state, and therefore the inhibition ag'ainst increase or decrease of compensation if given its full force or given a strictly literal construction, does not apply to additional salary provided by counties or municipalities.
4. The act of Feb. 4, 1920, containing no restrictions or limitations as to judges filling unexpired terms, the additional salary therein provided for is available and should be paid all judges now serving and performing duties as such, from the time the act becomes effective, May 24, 1920.
In conformity with the foregoing opinion in which I have endeavored to express my understanding of the law, etc., I hold that the plaintiffs have a right to a writ of mandamus in this case. Said demurrer is overruled and defendant not desiring to plead further, the order of the court is that a writ of mandamus issue against the defendant in accordance with the prayer of the petition of said relators.